Ryan B. Bell (9956)
Shelby Jaye Hughes (16690)
**KUNZLER BEAN & ADAMSON, PC**
50 W. Broadway, 10ᵗʰ Floor
Salt Lake City, Utah 84101
Telephone: (801) 994-4646
Facsimile: (801) 758-7436
rbell@kba.law
shughes@kba.law

*Attorneys for Plaintiff Sunwest Bank*

## IN THE THIRD JUDICIAL DISTRICT COURT OF SALT LAKE
## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| SUNWEST BANK, a Utah corporation,<br><br>    Plaintiff,<br><br>v.<br><br>GANNETT CO., INC., a Delaware corporation, and JOURNAL SENTINEL INC., a Wisconsin corporation;<br><br>    Defendants. | **SUMMONS**<br>**(Gannett Co., Inc.)**<br><br>Case No.: 240908461<br><br>Judge: Amber M. Mettler<br><br>TIER 3 |

THE STATE OF UTAH TO:

   G̲A̲N̲N̲E̲T̲T̲ ̲C̲O̲.̲,̲ ̲I̲N̲C̲.̲
   Attn: Corporation Service Company, Registered Agent
   251 Little Falls Drive
   Wilmington, DE 19808

    You are being sued.  A Complaint has been filed against you with the Third Judicial

District Court of Salt Lake in and for Salt Lake County, which is located at the Matheson

Courthouse, 450 South State Street, Salt Lake City, Utah 84114.  Within 30 days after service of

this Summons and Complaint, you must answer the Complaint in writing.  If you fail to do so,

judgment by default will be entered against you for the relief requested in the Complaint.

| | |
|---|---|
| A lawsuit has been filed against you. You must respond in writing by the deadline for the court to consider your side. The written response is called an Answer. | Se ha presentado una demanda en su contra. Si desea que el juez considere su lado, deberá presentar una respuesta por escrito dentro del periodo de tiempo establecido. La respuesta por escrito es conocida como la Respuesta. |
| **Deadline!** | **¡Fecha límite para contestar!** |
| Your Answer must be filed with the court and served on the other party **within 30 days** of the date you were served with this Summons. If you do not file and serve your Answer by the deadline, the other party can ask the court for a default judgment. A default judgment means the other party can get what they asked for, and you do not get the chance to tell your side of the story. | Su Respuesta debe ser presentada en el tribunal y también con la debida entrega formal a la otra parte **dentro de 30 días** a partir de la fecha en que usted recibió la entrega formal del Citatorio. Si usted no presenta una respuesta ni hace la entrega formal dentro del plazo establecido, la otra parte podrá pedirle al juez que asiente un fallo por incumplimiento. Un fallo por incumplimiento significa que la otra parte recibe lo que pidió, y usted no tendrá la oportunidad de decir su versión de los hechos. |
| **Read the complaint/ petition** | **Lea la demanda o petición** |
| The Complaint or Petition has been filed with the court and explains what the other party is asking for in their lawsuit. Read it carefully. | La demanda o petición fue presentada en el tribunal y ésta explica lo que la otra parte pide. Léala cuidadosamente. |

**Answer the complaint/petition**

You must file your Answer in writing with the court **within 30 days** of the date you were served with this Summons. You can find an Answer form on the court's website: utcourts.gov/ans

Scan QR code
to visit page

**Cómo responder a la demanda o petición**

Usted debe presentar su Respuesta por escrito en el tribunal **dentro de 30 días** a partir de la fecha en que usted recibió la entrega formal del Citatorio. Puede encontrar el formulario para la presentación de la Respuesta en la página del tribunal: utcourts.gov/ans-span

Para accesar esta página
escanee el código QR

**Serve the Answer on the other party**

You must email, mail or hand deliver a copy of your Answer to the other party (or their attorney or licensed paralegal practitioner, if they have one) at the address shown at the top left corner of the first page of this Summons.

**Entrega formal de la respuesta a la otra parte**

Usted deberá enviar por correo electrónico, correo o entregar personalmente una copia de su Respuesta a la otra parte (o a su abogado o asistente legal, si tiene) a la dirección localizada en la esquina izquierda superior de la primera hoja del citatorio.

**Finding help**

The court's Finding Legal Help web page (utcourts.gov/help) provides information about the ways you can get legal help, including the Self-Help Center, reduced-fee attorneys, limited legal help and free legal clinics.

Scan QR code
to visit page

**Cómo encontrar ayuda legal**



Para información sobre maneras de obtener ayuda legal, vea nuestra página de Internet Cómo Encontrar Ayuda Legal. (utcourts.gov/help-span)

Para accesar esta página
escanee el código QR

Algunas maneras de obtener ayuda legal son por medio de una visita a un taller jurídico gratuito, o mediante el Centro de Ayuda. También hay ayuda legal a precios de descuento y consejo legal breve.



An Arabic version of this document is available on the court's website:

نسخة عربية من هذه الوثيقة على موقع المحكمة على الإنترنت:توجد

utcourts.gov/arabic

A Simplified Chinese version of this document is available on the court's website:

本文件的简体中文版可在法院网站上找到：

utcourts.gov/chinese



A Vietnamese version of this document is available on the court's website:

Một bản tiếng Việt của tài liệu này có sẵn trên trang web của tòa:

utcourts.gov/viet



DATED: October 21, 2024.

KUNZLER BEAN & ADAMSON, PC


/s/ Ryan B. Bell
Ryan B. Bell
Shelby Jaye Hughes

*Attorneys for Plaintiff Sunwest Bank*

Ryan B. Bell (9956)
Shelby Jaye Hughes (16690)
**KUNZLER BEAN & ADAMSON, PC**
50 W. Broadway, 10th Floor
Salt Lake City, Utah 84101
Telephone: (801) 994-4646
Facsimile: (801) 758-7436
rbell@kba.law
shughes@kba.law

*Attorneys for Plaintiff Sunwest Bank*

| If you do not respond to this document within applicable time limits, judgment could be entered against you as requested. |

---

## IN THE THIRD JUDICIAL DISTRICT COURT OF SALT LAKE
## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| SUNWEST BANK, a Utah corporation,<br><br>        Plaintiff,<br><br>v.<br><br>GANNETT CO., INC., a Delaware corporation, and JOURNAL SENTINEL INC., a Wisconsin corporation;<br><br>        Defendants. | **COMPLAINT**<br><br>**(JURY DEMANDED)**<br><br>Case No.: _____<br><br>Judge:_____<br><br>TIER 3 |

Plaintiff Sunwest Bank ("Plaintiff" or "Sunwest"), by and through its above counsel of record, hereby complains and alleges against Defendants Gannett Co., Inc. ("Gannett") and Journal Sentinel Inc. ("Journal Sentinel") (collectively, "Defendants") as follows:

### INTRODUCTORY STATEMENT

As a long-running newspaper within a national journalistic network, the Milwaukee Journal Sentinel has a responsibility to the public to publish the truth, and to filter out of its pages the lies and invective that bad actors wish to disseminate for their own purposes. The paper badly

shirked this core responsibility, and failed the public, when it published a story about Sunwest Bank on September 19, 2024. The article appears intended as a political hit piece against a candidate for the United States Senate. But the Journal Sentinel's inclusion of Sunwest Bank as a central figure in the narrative, surrounded by numerous falsehoods and misleading framing, moved the article out of the realm of politics and into the wrongful defamation of a well-regarded, highly sophisticated, private banking institution. What is worse, the paper credulously printed the inflammatory statements of a political operative, again, trying to harm a political candidate, but pulling Sunwest directly into the crossfire.

The Journal Sentinel did not simply re-print these accusations as the groundless meanderings of a political hired gun. It gave its imprimatur to the accusations, leaving the strong impression that Sunwest deals unconscionably with corrupt criminal institutions. But Defendants knew better. Before the piece was published, Sunwest explained in great detail that the accusations were false and that it had carefully considered and vetted the transactions and banking customer at issue. The paper published its piece regardless and has left it in circulation online to the current day.

Sunwest has suffered damages as a result. Management at Sunwest now receives questions from existing and prospective customers, as well as employees, asking about the article and the alleged links with criminal organizations and money laundering. These are only the examples that Sunwest has heard about from its customers, making it likely there are numerous others who have heard the inflammatory allegations. The wide circulation of these false allegations has created existing reputational damage and unknown future impacts to Sunwest's stellar reputation. These

effects are continuing and will certainly cause future harm as well, particularly if they go uncorrected.

Defendants were warned that their story was false. They published it anyway and have caused harm to a highly reputable bank as a result. By this Complaint, Sunwest asks this Court to hold Defendants accountable for these wrongful acts to the full extent of Utah law.

## PARTIES, JURISDICTION, AND VENUE

1.     Sunwest Bank is a Utah corporation with its principal place of business in Salt Lake County, Utah, and located at 10011 Centennial Parkway, Sandy, Utah, 84070.

2.     Many of Sunwest Bank's customers reside in Utah.

3.     Sunwest Bank's servers (that host its email and internet services) are located in Utah.

4.     A substantial portion of Sunwest Bank's employees and agents are located and reside in Utah.

5.     Journal Sentinel Inc. is a Wisconsin corporation with its principal office located at 1675 Broadway, 23rd Floor, New York, New York 10019.

6.     Journal Sentinel Inc. publishes a general circulation newspaper distributed in Milwaukee, Wisconsin and surrounding areas.

7.     Journal Sentinel Inc. also publishes its articles through its website https://www.jsonline.com/ and through its "eNewspaper."

8.     Subscriptions to the Journal Sentinel Inc. may be purchased from any location via the paper's website. On information and belief, Utah residents visit https://www.jsonline.com/ as well as subscribe to the eNewspaper.

9.     Like many news publications today, Journal Sentinel Inc. is part of a broader news distribution conglomerate, Gannett Co., Inc., which is commonly referred to as the USA Today Network.

10.     Gannett Co., Inc. owns and operates the Journal Sentinel Inc., as well as USA Today, which is a general circulation newspaper distributed nationally, including in Utah, and The Spectrum, a general circulation newspaper distributed in St. George, Utah and surrounding areas.

11.     The Journal Sentinel Inc., like The Spectrum, holds itself out to be "Part of the USA TODAY Network."

12.     As part of its ownership, operations, and control over Journal Sentinel Inc., Gannett Co., Inc. directs the majority of the Journal Sentinel Inc.'s disclosed information in its footer section on the https://www.jsonline.com/ webpage to USA Today and/or Gannett Co., Inc.'s policies, terms, and other business material.

13.     Specifically, the Journal Sentinel Inc.'s:

a.     "Our Ethical Principles" link directs to a webpage entitled "USA TODAY NETWORK Principles of Ethical Conduct For Newsrooms."

b.     "Accessibility Support" link directs to USA Today's "Accessibility Support" policy.

c.     "Responsible Disclosure" link directs to Gannett Co., Inc.'s Responsible Disclosure Program.

d.     "Privacy Policy" link directs to "GANNETT PRIVACY POLICY."

e.     "Careers" link directs to "Careers - Gannett."

f.     "Contact Us" page provides the following statement as a caption to the header: "This site is part of the USA TODAY Network and is owned and operated by Gannett Co., Inc."

g.     "Support Local Businesses" link directs to USA Today's "Support Local Business" page.

h.     "Advertising Acceptance Policy" link directs to an ADVERTISING SERVICES AGREEMENT copyrighted by Gannett Co., Inc.

i.     "Milwaukee Journal Sentinel Store" and "Shopping" links both direct to merchandise pages that are controlled by the web domains "usatodaystore.com" and "usatoday.com," respectively.

j.     "Licensing and Reprints" link directs to USA Today Network's "Licensing and Reprints" page.

k.     "Education" link directs to "GANNETT MEDIA EDUCATION"

l.     "10Best" link directs to "USA TODAY 10Best"

m.     "LocaliQ Digital Marketing Solutions" link directs to LocaliQ.com, which is run by Gannett Co., Inc.

14.     Additionally, Gannett Co., Inc. has copyrighted Journal Sentinel Inc.'s Terms of Service and Subscription Terms & Conditions for Journal Sentinel.

15.     Accordingly, Gannett Co., Inc. enjoys substantial control over both Journal Sentinel Inc. and the Journal Sentinel Inc. newspaper, and/or separation between these entities is so vague or insubstantial as to make Gannett Co., Inc. legally responsible for the statements of Journal Sentinel Inc. and the Journal Sentinel Inc. newspaper.

16.     Gannett Co., Inc. is a Delaware corporation with its principal place of business in New York County, New York, at 1675 Broadway, 23rd Floor, New York, New York 10019.

17.     This Court has personal jurisdiction over Gannett Co., Inc. in this matter because Gannett Co., Inc. caused injury in Utah and because Gannett Co., Inc. conducts substantial business in Utah through its distributions of its publications of the USA Today Network, which is so continuous and systematic as to render it essentially at home in this forum.

18.     Gannett Co., Inc. is also subject to Utah's jurisdiction because its USA Today Network reporter, Daniel Bice, reached into Utah when he contacted Sunwest Bank, a Utah business, in September 2024 to discuss various false assertions about Sunwest Bank ("the False Statements"), which are detailed below, that Gannett Co., Inc. anticipated publishing in its USA Today Network.

19.     During those communications, Sunwest Bank notified Mr. Bice that it was a Utah corporation.

20.     Sunwest Bank exchanged correspondence with Sunwest Bank representatives via email accounts based on servers located in Utah.

21.     Additionally, at least one of Sunwest Bank's representatives was located in Utah while conferring, investigating, and aiding in the response to the USA Today Network/Journal Sentinel Inc. reporter's inquiries.

22.     In these communications, the USA Today Network/Journal Sentinel Inc. reporter acknowledged the prospect of litigation if any USA Today Network newspaper published the False Statements, so it should have anticipated being haled into court in Utah.

23.     This Court also has personal jurisdiction over Journal Sentinel Inc. because Journal Sentinel Inc. conducted the following acts that created a close nexus between Utah and the underlying controversy of this litigation:

      a.     As outlined above, the Journal Sentinel Inc.'s agent made contacts with Utah when Gannett Co., Inc.'s USA Today Network reporter reached into Utah to get comments and information about Sunwest Bank to publish in the USA Today Network.

      b.     In these communications, Sunwest Bank told Defendants that it was a Utah Corporation and the USA Today Network reporter, acting as the Journal Sentinel Inc.'s agent, acknowledged the prospect of litigation if any USA Today Network newspaper published the False Statements, specifically identifying the Journal Sentinel Inc. Accordingly, the Journal Sentinel Inc. should have anticipated being haled into a court in Utah in the event it published those False Statements.

      c.     The Journal Sentinel Inc., despite knowing the falsity, published the False Statements, which were distributed throughout the country through its subscriptions, webpage, and eNewspaper, including to those located and residing in Utah.

      d.     Indeed, Sunwest Bank's Utah customers have contacted its Utah headquarters and staff to discuss their concerns about the accusations of Sunwest Bank described in the Journal Sentinel Inc.'s False Statements.

      e.     Thus, these False Statements published by Journal Sentinel Inc. harm not only Sunwest Bank but also the readers that reside in Utah.

      f.     In fact, a search conducted from within Utah on Google's 'News' search tool using the search terms "Sunwest Bank" garners as its very top result the same

defamatory story published by the Journal Sentinel Inc. that is at the heart of this dispute. *See* Google News Search Result, attached hereto as **Exhibit A**.

24.     In other words, Gannett Co. Inc./Journal Sentinel Inc. reached into Utah and the resulting activities forming the basis of this litigation took place in Utah, had effects felt by the broader forum, and are therefore subject to Utah's jurisdiction.

25.     Defendants are subject to the jurisdiction of the courts of Utah under Utah Code § 78A-5-102 and § 78B-3-205 (1)-(2); to wit: as outlined above, Defendants' publication of the False Statements affects persons and businesses (including, without limitation, Utah readers, Sunwest Bank, and Sunwest Bank's Utah customers) within Utah.

26.     Venue is proper in this Court under Utah Code § 78B-3a-201(1)(a), (2) because Sunwest Bank's injuries occurred in Salt Lake County and thus, all or part of the claims in this action arose in Salt Lake County and/or because Sunwest Bank has its principal place of business in Salt Lake County and regularly conducts business in Salt Lake County.

## FACTUAL ALLEGATIONS

### *Sunwest Bank*

27.     Sunwest is a state-chartered, Utah-based commercial bank in the United States providing business and personal banking services in Utah, as well as in Arizona, California, Florida, Idaho, and elsewhere.

28.     Sunwest specializes in working with small-to-medium businesses, entrepreneurs, privately held corporations, family offices, real estate developers, and other investors.

29.     Sunwest also provides correspondent banking services to international banks throughout the Americas.

30.    Sunwest has grown from a small, local bank to a regional bank over the past 10 years.

31.    Sunwest's growth has been possible because of its excellent reputation among businesses and the public.

32.    Like other financial institutions, Sunwest survives on its reputation, both locally and nationally.

33.    The Federal Deposit Insurance Corporation ("FDIC") and the Utah Department of Financial Institutions ("UDFI"), among others, regulate Sunwest's banking services and operations.

### *FCB Repatriation Program Background*

34.    One of the many services offered by Sunwest is foreign correspondent banking ("FCB").

35.    Fundamentally, FCB is a formal agreement or relationship between a U.S. bank (correspondent bank) and a foreign bank whereby the U.S. bank provides banking or payment services.

36.    These agreements are necessary to facilitate international financial transactions—including international trade, humanitarian efforts, and global tourism—because there is no formal central network that banks can use to move funds across borders.

37.    FCB relationships are governed and overseen by Federal law, which imposes stringent anti-money laundering requirements to prevent the kind of wrongdoing the Journal Sentinel accused Sunwest of committing.

38.     Federal law requires Sunwest to maintain a robust Bank Secrecy Act ("BSA") and anti-money-laundering ("AML") program, which must, at minimum, include designating a compliance officer, implementing ongoing training programs, establishing internal controls, and permitting independent audits. *See* 31 U.S.C. § 5318(h).

39.     U.S. banks must also comply with "know your customer" regulations, which requires them to develop customer profiles, assess risk of fraud and acquire additional information from higher-risk customers, and conduct ongoing monitoring to identify and report suspicious transactions. *See, e.g.,* 31 C.F.R. § 1020.210.

40.     U.S. banks must also comply with regulations imposed by the Office of Foreign Assets Control of the Department of Treasury. They must screen potential customers using the Specially Designated Nationals list and other similar sanction programs that target foreign persons, governments, sectors, and geographic locations.

41.     Sunwest takes its compliance duties seriously, and federal regulators have never raised any concerns about money laundering during their annual review of Sunwest's FCB services.

42.     This is largely because Sunwest maintains an AML program that exceeds the federal requirements.

43.     To start, Sunwest has dedicated a risk-management division for its FCB relationships that specializes in handling the unique complexities of the business line. Sunwest has developed and continually enhances a proprietary risk-management system for FCB services that monitors the foreign respondent bank activity, including the underlying cash transactions, to identify and prevent financial crimes. Sunwest's due diligence process involves a detailed risk

review of each foreign respondent bank, including an assessment of the country's risk profile; its financial and anti-money-laundering laws; the foreign bank's operations, products, services, and controls for financial crimes; and the foreign bank's customer base and sources of funds.

44.     Sunwest generally requires each foreign respondent bank to submit an annual independent audit report, which must detail its anti-money-laundering program, including its system for monitoring currency exports.

45.     Sunwest's compliance programs are reviewed annually by the FDIC, the UDFI, the Federal Reserve, and multiple independent financial audit firms.

46.     Sunwest consistently obtained satisfactory results from these reviews.

47.     One of the FCB services that Sunwest provides is repatriation of U.S. currency, which brings back into the U.S. physical USD banknotes that have been spent abroad, primarily related to tourism.

48.     This is an important function of the international currency system, as it helps maintain a stable global flow of funds since a foreign bank cannot independently return USD banknotes to the Federal Reserve itself.

49.     Because USD banknotes belong to the federal government, the Federal Reserve created the FCB's repatriation program to partner with U.S. banks to assist in facilitating the return of USD banknotes.

50.     All varieties of banks provide repatriation services. Bank of America, for example, controls most of the market for repatriation of USD banknotes from Mexico.

51.     Under the FCB repatriation program, the foreign bank ships the bulk USD banknotes directly to a branch of the U.S. Federal Reserve, which usually means the foreign bank

sends the money by commercial flight to Miami or Los Angeles, and from there by armored car directly to the local branch of the U.S. Federal Reserve.

52. The USD banknotes, or any other U.S. currency, are not shipped to Sunwest itself.

53. Before Sunwest can facilitate any repatriation transaction for a foreign bank, it must secure authorization from the Federal Reserve. It must provide details about the foreign respondent bank and enter into a formal compliance agreement with the Federal Reserve.

54. Sunwest vets repatriation requests using its proprietary risk management system, which checks for suspicious users, amounts, timing of deposits, etc., to ensure that the cash does not originate from criminal or sanctioned sources.

55. The Federal Reserve also reviews whether the appropriate safeguards are in place at the U.S. bank via its BSA, Office of Foreign Assets Control, and anti-bribery/corruption ("ABC") programs before agreeing to accept repatriated funds.

56. Upon receipt, the Federal Reserve then credits the appropriate U.S. bank's account for the equivalent amount of USD banknotes and only then, upon confirmation of the funds, would the U.S. bank credit the foreign bank's U.S. bank account.

57. The process described in paragraphs 46–55 above shall be generally referred to as "Repatriation."

58. The Repatriation program requires participants to go through rigorous efforts to ensure that no money laundering or other financial crimes take place.

59. Such requirements include, without limitation:

a.      Maintaining a robust BSA and AML program, which must, at minimum, include designating a BSA officer, implementing ongoing training programs, and performing independent audits. *See* 31 U.S.C. § 5318(h).

b.      Fulfilling Customer Due Diligence Requirements for Financial Institutions (the "CDD Rule"). These requirements were published on May 11, 2016, and amended on September 29, 2017, which amended the BSA. The CDD Rule requires that U.S. banks understand the nature and purpose of customer relationships for the purpose of developing a customer risk profile and conducting ongoing monitoring in order to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information. *See* 31 CFR §§ 1020.210.

c.      Assessing the risk profile of the foreign bank to determine, on the basis of risk, whether a customer presents a higher risk profile and, accordingly, to collect more information to better understand the customer relationship. *See* August 3, 2020 FinCEN guidance.

d.      Conducting due diligence, in some cases, enhanced due diligence, of correspondent accounts established or maintained for foreign financial institutions. *See* § 312 of the USA PATRIOT Act.

e.      Oversight by the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury, which administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities

related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy, or economy of the United States.

      f.      Complying with the various OFAC regulations, including the requirements to search for individuals added to the Specially Designated Nationals ("SDN") list, and the different sanction programs that target other foreign persons, governments, sectors, and geographic locations.

      g.      Conducting and maintaining adequate due diligence on correspondent bank accounts held on behalf of foreign banks and ensuring those due-diligence systems are "reasonably designed to detect and report instances of money laundering through those accounts." 31 U.S.C. § 5318(i).

60.      Finally, to ensure compliance and encourage that U.S. banks prevent money laundering and other financial crimes, as a matter of federal law, the U.S. correspondent bank participating in the FCB programs can be held liable for violations of anti-money laundering or other financial-crime laws committed by their foreign correspondent bank.

### *Sunwest's FCB Compliance and Diligence to Prevent Financial Crimes*

61.      Sunwest conducts due diligence and analyzes risks pertaining to foreign jurisdictions, foreign banks, and the source of funds, which enables them to make risk-based decisions and creates a safer financial environment for movement of funds.

62.      As part of its Repatriation due diligence on foreign bank clients, Sunwest reviews the foreign bank's anti-money laundering and financial crimes ("AML") programs, reviews their AML audit reports and cash reports, conducts site visits, reviews their AML internal controls, AML training, and AML staff, among other factors to identify if there are any systemic material

deficiencies or risks and to determine if it is within its risk appetite and has adequate controls to identify, mitigate, and report suspicious activity to U.S. law enforcement.

63.     Moreover, Sunwest has implemented a robust AML program that exceeds the requirements of U.S. regulations related to financial crimes, including, but not limited to, the BSA, sanctions regulations established by the OFAC, and regulations established to combat bribery and corruption.

64.     Sunwest also has a dedicated risk management division for foreign correspondent banking relationships given the risk profile and complexity of the business line.

65.     Sunwest has developed and continually enhances its proprietary risk management system for its FCB services, which assists Sunwest in monitoring these relationships and the underlying exchange transactions to identify and prevent financial crimes from occurring.

66.     Sunwest completes this analysis prior to a foreign bank shipping U.S. banknotes to the Federal Reserve.

67.     Sunwest's due diligence process involves an ongoing detailed risk review of each foreign correspondent bank, including an assessment of the country's risk profile, financial and anti-money laundering laws, the foreign correspondent bank's operations, products, services, and controls for financial crimes.

68.     As required by BSA, OFAC, and its own internal policies, Sunwest regularly reviews the systems that its Repatriation partners, including Banco Azteca, has in place to prevent money laundering and other financial crimes and to ensure that its Repatriation partners' systems – including Banco Azteca's systems – are sufficient and compliant.

69.     Sunwest also vets Repatriation requests using a sophisticated proprietary risk management system to ensure that the cash does not originate from criminal or unsanctioned sources.

70.     Sunwest's system regularly analyzes transactions between the foreign bank and their clients that represent the source of funds.

71.     Sunwest's system also evaluates those individuals against sanctioned persons and jurisdictions.

### Mexico's Efforts to Thwart Laundering of U.S. Currency

72.     The government of Mexico has taken significant steps to combat money laundering.

73.     In addition to having strict oversight over its financial industry and banks, Mexico has also established limits to how many USD banknotes a person can exchange at any Mexican bank.

74.     For example, non-clients cannot exchange more than $300 per day or $1,500 per month. To exchange U.S. currency, they must provide their national identification card, and that information is scanned, extracted, and produced to Sunwest. Clients cannot exchange more than $4,000 per month. To become a client, a person must provide significantly more information, including employment details, sources of income, and expected activity information. All customers must also scan their fingerprint.

75.     Mexican banks must also verify the identities of the individuals, conduct various levels of due diligence, and screen the names against global sanction lists, including the U.S.'s sanction lists.

***Banco Azteca's Efforts to Prevent Money Laundering and Other Financial Crimes***

76.     Banco Azteca, which is the 11th largest bank in Mexico, has multiple FCB

relationships in the United States and internationally—not just with Sunwest.

77.     Banco Azteca has comprehensive systems that employ real-time technology to

prevent and detect financial crimes, including money laundering, at the macro and micro levels.

78.     As required by Mexican regulations, Banco Azteca limits customer and non-

customer daily and monthly deposits and withdrawals; checks global sanction lists before

permitting an individual to conduct any type of transaction within its institution; and employs

sophisticated real-time technology to identify money laundering patterns in cash transactions and

in their other services.

79.     Banco Azteca's system also includes scanning, storing, and using identities of the

individuals who exchange U.S. dollars through Banco Azteca's national identification cards in

order to generate reports that are provided to Sunwest.

80.     Banco Azteca collects additional due diligence regarding individuals who exchange

U.S. dollars through Banco Azteca such as verifying employment, source of income, and expected

activity information.

81.     Banco Azteca employs sophisticated real-time technology to identify money

laundering patterns in cash transactions, as well as in their other services. The technology monitors

activity by branch and region based on expected tourism and exchange activity. The system also

checks for patterns and red flags in individual transactions.

82.     Each cashier has an alarm button to notify the compliance department of any

suspicious cash transaction.

83.     Banco Azteca collaborates with U.S. law enforcement officials to share new money laundering typologies and patterns it identifies through its anti-money-laundering program.

84.     Banco Azteca has additionally implemented blockchain technology that contains an incorruptible trail of every cash transaction.

85.     Banco Azteca annually has an AML audit to review its Repatriation program, which also analyzes its cash export process.

86.     Banco Azteca also collaborates with U.S. law enforcement officials to share new money laundering typologies and patterns it identifies through its AML program.

87.     Banco Azteca has consistently obtained satisfactory AML audits and has not been subject to enforcement actions from its banking regulator.

### *Sunwest's FCB Repatriation Work with Banco Azteca*

88.     As do many other reputable U.S. banks, Sunwest provides FCB services to banks in Mexico.

89.     Specifically, Sunwest provides Repatriation services to Banco Azteca, as well as ancillary wire transfer services for U.S. payments related to the foreign bank's ordinary vendors or suppliers of services.

90.     In doing so, Sunwest considers its legal requirements and its robust compliance and prevention policies among its very highest priorities. It has a zero-tolerance threshold for any financial crimes occurring in connection with its services.

91.     In addition to complying with the federal rules, regulations, and laws outlined above, Sunwest also:

    a.      Analyzes samples of the national identification cards Banco Azteca collects on an ongoing basis to ensure that none of those funding individuals are not known or suspected money launderers or complicit in financial crimes; and

    b.      Requires Banco Azteca to regularly provide Sunwest with its audits (all of which are conducted by a U.S. audit firm) analyzing its AML and Repatriation program, which includes a list of the sources of funds of every cash transaction conducted during the audit period and a review of its AML and financial-crimes prevention programs.

92.     Based on all the due diligence conducted by Sunwest, Banco Azteca has maintained consistently high standards in its fight against money laundering and drug cartels.

93.     Sunwest's Repatriation programs (including its relationship with Banco Azteca) are reviewed annually by the FDIC, the UDFI, the Federal Reserve, and multiple independent financial audit firms, including submitting each of its Foreign Correspondent Banks (including Banco Azteca) to review conducted by an independent U.S. financial audit firm.

94.     Sunwest is transparent about the FCB services it provides to Banco Azteca, which inherently requires that the FDIC, the UDFI, the Federal Reserve, and multiple independent financial audit firms review the audit documentation provided by Banco Azteca.

95.     Put simply, Sunwest's and Banco Azteca's Repatriation relationship and transactions are closely overseen and scrutinized by the U.S. federal government and multiple regulatory agencies.

96.     Sunwest has consistently obtained satisfactory results from its reviews and audits, including those related to its Repatriation programs.

97.     Sunwest has never faced an enforcement action related to its Repatriation services or any violation of anti-money laundering or financial-crimes laws.

98.     And, if Banco Azteca were engaged in money laundering or other financial crimes, there would have been a public enforcement action against Sunwest.

### Gannett and Journal Sentinel's Publication of the False Statements

99.     At some point before September 19, 2024, Arik Wolk, the Rapid Response Director for the Democratic Party of Wisconsin, provided several false statements about Sunwest to Daniel Bice, a USA Today Network journalist.

100.    Upon learning that Defendants contemplated publishing a story premised on Mr. Wolk's false statements about Sunwest, Sunwest provided a detailed outline of the Foreign Correspondent Banking platform and rigorous compliance program to expressly notify Defendants of the falsity of the statements.

101.    Mr. Bice then contacted Sunwest in September 2024 requesting Sunwest's comments and response to Mr. Wolk's statements by phone and email.

102.    Sunwest, in turn, fully demonstrated the falsity of Mr. Wolk's statements and implications through email and phone call conversations. *See* 2024.09.13 Responses to Wolk's Questions attached hereto as **Exhibit B**.

103.    Specifically, Sunwest explained FCB services and the repatriation of USD banknotes through the Federal Reserve processes, including, without limitation, the details described in paragraphs 46-55 above.

104. Sunwest further explained its efforts to ensure that it did not participate in or facilitate money laundering or other financial crimes, particularly in providing FCB services, including, without limitation, the details described in described in paragraphs 57-70 above.

105. Sunwest also explained that providing FCB services is a highly regulated industry that is overseen by numerous government agencies, including the Federal Reserve, FDIC, and FINCEN to ensure that no money laundering or other financial crimes are taking place, which included details described in paragraphs 57-70 above.

106. Moreover, Sunwest further debunked other unsubstantiated articles that Defendants had cited in support of Mr. Wolk's statements by clarifying that those articles discussed a "remittance" program, which was distinct and separate from the repatriation services Sunwest provides.

107. Sunwest explained that it had never provided "remittance" services, nor had it participated in a "remittance" program.

108. Sunwest further notified Defendants on September 13, 2024, that Mr. Wolk's statements, including those accusing Sunwest of engaging in criminal or other unlawful conduct consisted of nothing more than "unfounded allegations and speculation," particularly given the discredited information the accusations relied upon and the broad scope of "overarching regulatory framework and federal oversight" over Sunwest's FCB programs. *See* September 13, 2024 Letter attached hereto as **Exhibit C**.

109. In light of the accusations being exposed as groundless, Sunwest urged Defendants to proceed cautiously as the publication of any refuted allegations would be understood to have

been done with intent to harm Sunwest's reputation. Sunwest warned that it would seek judicial intervention in the event of publication. *See id.*

110.    Gannett and Journal Sentinel disregarded these clear indications of the falsity of Mr. Wolk's statements and of the story put together by its reporter, Mr. Bice.

111.    On September 19, 2024, Journal Sentinel published and Gannett caused and permitted the Journal Sentinel to publish an article titled "Democrats Question Eric Hovde over His Bank's $26M Deal with a Troubled Mexican Bank" by Daniel Bice (the "Article"). The Article is attached hereto as **Exhibit D**.

112.    The Article states or implies numerous False Statements about Sunwest.

113.    Those False Statements include, without limitation, the following statements and implications:

    a.      "Banco Azteca…has had its share of problems in recent years. Accused in past news stories of having links to the Mexican drug cartel."

    b.      Banco Azteca has been "Dropped as a financial partner by some U.S. banks because of 'risk and compliance concerns.'"

    c.      Banco Azteca is "now caught up in a Texas bribery scheme with an American congressman."

    d.      Sunwest "doesn't mind doing business with [Banco Azteca]" and, implied, is knowingly doing business with a Mexican bank linked to drug cartels that has risk and compliance concerns, is involved in bribery schemes, and is otherwise involved in nefarious and illicit financial dealings.

e.      Banco Azteca, as part of its relationship with Sunwest, "sent $26.2 million in cash to [Sunwest] on four airplane flights."

f.      "[Sunwest's] transactions with Banco Azteca are 'extraordinarily concerning,' especially given the alleged past ties between Azteca and the drug cartel."

g.      Sunwest's representatives were "'flying cash across the border for a bank suspected of working for criminal groups that are pouring deadly fentanyl into our state,'" and Sunwest is thus responsible for trafficking in fentanyl and other crimes associated with criminal groups, such as money laundering, importing and distributing narcotics, and kidnapping.

h.      Sunwest is accepting the repatriation of U.S. dollars through the Federal Reserve in an inappropriate and illegal scheme.

i.      "[A]s recent as 2021, Banco Azteca had no correspondent banks in the U.S. with which it could transfer U.S. currency," and Sunwest is thus the only correspondent bank that Banco Azteca sends cash to.

j.      Sunwest is operating in a nefarious, illegal manner. Indeed, a reasonable person would conclude that the statements—that Banco Azteca is a "bank linked to Mexican drug cartel" and "Multiple U.S. banks have cut ties with Banco Azteca"—indicate that Sunwest is breaking the law by providing correspondent banking services to Banco Azteca.

114.    The Article also includes a quote from Mr. Wolk stating that Eric Hovde, who is Sunwest's CEO, "will do anything to enrich himself," making the very strong implication that the actions of Sunwest were criminal and/or improper.

115.   The Article quotes dated articles, blog posts, and other information as fact when the contents of those sources are highly speculative and outdated, while also conflating remittance business with the FCB services and contracts associated with Sunwest.

116.   The Article implies that Sunwest has acted improperly, despite Sunwest previously providing extensive answers and facts to outline its legitimate business and negate their concerns.

117.   Sunwest communicated to Defendants with particularity that (a) Sunwest and Banco Azteca have extensive systems in place to identify and prevent money laundering and other crimes; (b) every aspect of Sunwest's business relationship with the Banco Azteca is highly regulated and overseen by the federal government; (c) Sunwest conducts its Repatriation program legally and in accordance with best practices; (d) Sunwest has never and would never knowingly do business with any bank or other entity involved in the criminal activities alleged in the Article; (e) based on its review of Banco Azteca, there is no credible evidence that Banco Azteca is working with any Mexican drug cartel or is in any way engaged in or facilitating money laundering or other crimes; and (f) if any of the False Statements were accurate, Sunwest would be in violation of laws and regulations and unable to legally conduct business or provide financial services.

118.   As articulated to Defendants and herein, the Article, the False Statements, and implications arising therefrom, are false, and Sunwest provided Defendants with copious amounts of support proving that the Article, the False Statements, and implications arising therefrom were untrue and grossly misleading.

119.   Based on the information provided to Defendants prior to publishing the Article, which includes the information described above, Defendants knew that the False Statements were false and misleading.

120.   Furthermore, had Defendants undertaken reasonable journalistic due diligence, Defendants would have reasonably appreciated there was no basis for the False Statements because they would have realized that Sunwest carefully complies with federal anti-money laundering laws and regulations.

121.   The False Statements and implications arising from the Article regarding Sunwest are, at minimum, recklessly false because they contradict publicly available information about Sunwest's compliance with federal anti-money laundering laws.

122.   Even the information cited and relied upon in the Article does not support the claim that Banco Azteca is knowingly providing money-laundering services to Mexican drug cartels (those articles and blogs explain that drug cartels are trying to use remittances (not Repatriation programs) to send drug proceeds back to Mexico. And, even still, those articles and blogs note that Mexican banks, including Banco Azteca specifically, are actively policing remittances to stop this practice).

123.   Instead of publishing credible information, Defendants published the Article with the False Statements to generate online traffic premised on information related to a heated political campaign that intentionally disparages Sunwest, a non-public, private party.

124.   Upon information and belief, Defendants intended to secure widespread notice for the Article and further promoted the Article by causing the Article's headline to appear, with links, on the Journal Sentinel's website and through other means despite knowing its falsity.

125.   Upon information and belief, a copy of the Article was delivered to each of the Journal Sentinel's approximately 48,000 print subscribers, which includes Utah residents and subscribers who are located in Utah.

126.    The Article was posted to the Journal Sentinel's website and remains available there at
https://www.jsonline.com/story/news/politics/elections/2024/09/19/democrats-question-eric-
hovde-over-his-banks-deal-with-mexican-bank/75209295007/.

127.    The Article is therefore available to any individual with an internet connection.

128.    Further, the contents of the False Statements, since they were published by
Defendants who hold themselves out as upholding the principles of journalistic integrity, have
been reprinted and incorporated into other articles and TV advertisements, further harming
Sunwest.

129.    Upon information and belief, as a result of the efforts of Defendants, the Article has
been linked to or referenced on multiple online platforms, including X (formerly known as Twitter)
and Reddit.

130.    Upon information and belief, the Article has been viewed online by thousands of
individuals, including those located and residing in Utah.

131.    Indeed, Sunwest's Utah customers have contacted Sunwest through its Utah
headquarters to discuss their concerns about the accusations described in the False Statements.

132.    The Article's contents and the False Statements are defamatory because they
affirmatively state that Sunwest, by working with Banco Azteca, is illegally providing financial
services to Mexican drug cartels.

133.    The Article's contents and False Statements are also defamatory because a
reasonable person would conclude that the False Statements—such as, but not limited to, those
that Banco Azteca is a "bank link[ed] to the Mexican drug cartel" and has been "[d]ropped as a

financial partner by [other] U.S. banks"—communicate that Sunwest is breaking the law by having a relationship with and providing correspondent banking services to Banco Azteca.

134. Defendants also defame Sunwest because the Article communicates that Sunwest has broken federal law by failing to ensure that both itself and Banco Azteca have adequate systems in place to prevent money laundering.

135. And, by linking Sunwest to alleged criminal activities, the publication of the Article has caused ongoing harm to Sunwest's reputation, its ability to attract and retain customers, and its potential to continue growing into new states and markets.

136. Thus, Defendants have made reputationally damning statements about Sunwest, affecting Sunwest's current and prospective customers. Furthermore, if such statements were true, these allegations would subject Sunwest to regulatory investigations, enforcement actions, and other significant legal ramifications. Accordingly, the accusations of Mr. Wolk and of Journal Sentinel accuse Sunwest of criminal and/or highly illegal conduct.

137. Thus, the False Statements and implications arising from the Article regarding Sunwest allege criminal conduct on the part of Sunwest, as well as conduct that is incongruous with the exercise of a lawful business, trade, profession, or office.

138. The Article discusses Eric Hovde, who is a current candidate for the United States Senate. However, Sunwest is not a participant in that campaign, nor has it inserted itself into the campaign or the public discussion surrounding it. Accordingly, Sunwest is not a public figure for purposes of applying any defamation privilege.

139.   Defendants may not seek to impose a heightened standard of fault to govern their defamatory statements against a private banking institution merely because those statements were made in the context of a political campaign that does not involve Sunwest.

**FIRST CAUSE OF ACTION**
**(Defamation and Defamation Per Se – Both Defendants)**

140.   Sunwest incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

141.   Defendants published the Article (or caused the Article to be published) in the print and online editions of the Journal Sentinel.

142.   Defendants also published the Article to the Journal Sentinel's website, which remains available there at https://www.jsonline.com/story/news/politics/elections/2024/09/19/democrats-question-eric-hovde-over-his-banks-deal-with-mexican-bank/75209295007/.

143.   Defendants intended the Article and False Statements to refer to Sunwest, which was specifically identified in the Article.

144.   Alternatively, Defendants acted negligently in failing to anticipate the facts or circumstances that would cause a reader of the Article and/or False Statements to reasonably understand the Article and/or False Statements to Sunwest.

145.   The False Statements and implications arising from the Article regarding Sunwest are presented as statements of fact, not opinion. To the extent any of the statements are couched as opinions, the surrounding context suggests to the reader that such statements are premised on facts known to the speaker, including Mr. Wolk.

146.   The False Statements and implications arising from the Article regarding Sunwest are not privileged.

147. The False Statements and implications arising from the Article regarding Sunwest are false.

148. Defendants knew or should have known the False Statements and implications arising from the Article regarding Sunwest were false based on information provided to them prior to publication, based on review of the materials cited in the Article, and based on publicly available information known to them or that they would have discovered had they undertaken reasonable journalistic due diligence.

149. Accordingly, at the time Defendants published the Article with the False Statements, they did not take reasonable care to avoid the publication of substantially false statements as they had actual knowledge the False Statements were false or should have entertained serious doubts as to whether the False Statements were true.

150. Put simply, Defendants have acted with knowledge of the falsity of the Article, or with reckless disregard of its truthfulness, and without care for the injuries it caused as set forth above.

151. The False Statements call into question Sunwest's honesty, integrity, virtue, and/or reputation, and thereby expose Sunwest to public hatred, contempt, or ridicule in the eyes of at least a substantial and respectable portion of its audience.

152. The Article constitutes defamation *per se* because the Article accuses Sunwest of involvement in or responsibility for money laundering, drug trafficking, kidnapping, and bribery, or, at minimum, of knowingly doing business with a Mexican bank that engages in such activity.

153. The Article also accuses Sunwest of conduct which is incongruous with the exercise of a lawful business, trade, profession, or office.

154.    The serial and ongoing publication of the Article is causing, and will continue to cause, injuries to Sunwest.

155.    That necessarily includes reputational harm to Sunwest, including, without limitation, lost business opportunities.

156.    As a result, Sunwest has suffered actual damages in an amount to be proven at trial, but in no event less than $2,000,000.00.

157.    Defendants' acts demonstrate willful or reckless indifference to Sunwest's rights and are so egregious as to warrant punitive damages in support of this cause of action.

## SECOND CAUSE OF ACTION
### (False Light – Both Defendants)

158.    Sunwest incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

159.    Defendants published the Article (or caused the Article to be published) in the print and online editions of the Journal Sentinel.

160.    Defendants also published the Article to the Journal Sentinel's website, which remains available there at https://www.jsonline.com/story/news/politics/elections/2024/09/19/democrats-question-eric-hovde-over-his-banks-deal-with-mexican-bank/75209295007/.

161.    Defendants published the False Statements about Sunwest, which objectively include statements and implications that would communicate to a reasonable reader that Sunwest does business with a cartel-linked Mexican bank that is involved in money laundering, drug trafficking, kidnapping, and bribery, and therefore that Sunwest shares responsibility for those actions.

162. The False Statements and implications arising from the Article place Sunwest before the public in a false light.

163. The false light in which Sunwest has been placed would be highly offensive to any reasonable person, as it associates Sunwest with the criminal activity alleged in the Article, including, without limitation, that Sunwest does business with a cartel-linked Mexican bank that is involved in money laundering, drug trafficking, kidnapping, and bribery, and therefore that Sunwest shares responsibility for those actions.

164. Defendants knew or should have known the False Statements and implications arising from the Article regarding Sunwest were false based on information provided to them prior to publication, based on review of the materials cited in the Article, and based on publicly available information known to them or that they would have discovered had they undertaken reasonable journalistic due diligence.

165. Accordingly, at the time Defendants published the Article with the False Statements, they did not take reasonable care to avoid the publication of substantially false statements, as they had actual knowledge the False Statements were false or should have entertained serious doubts as to whether the False Statements were true.

166. Put simply, Defendants have acted with knowledge of the falsity of the Article, or with reckless disregard of its truthfulness, and without care for the injuries it caused, as set forth above.

167. The serial and ongoing publication of the Article is causing, and will continue to cause, enormous injuries to Sunwest.

168.    That necessarily includes reputational harm to Sunwest, including, without limitation, lost business opportunities.

169.    As a result, Sunwest has suffered actual damages in an amount to be proven at trial, but in no event less than $2,000,000.00.

170.    Defendants' acts demonstrate willfulness or reckless indifference to Sunwest's rights and are so egregious as to warrant punitive damages in support of this cause of action.

### THIRD CAUSE OF ACTION
### (Permanent Injunction – Both Defendants)

171.    Sunwest incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

172.    Defendants' actions have caused, and are substantially likely to continue to cause, irreparable harm to Sunwest.

173.    Defendants' actions are ongoing and are substantially likely to continue.

174.    Sunwest's claims are meritorious, and Sunwest should prevail on its above causes of action.

175.    The balance of harms between the parties strongly favors entry of an injunction against Defendants.

176.    Public policy strongly favors entry of an injunction so as to prevent further falsehoods and additional irreparable injuries to Sunwest.

177.    Accordingly, Sunwest is entitled to a permanent injunction restraining Defendants from making disparaging statements regarding Sunwest in any medium or forum.

### JURY DEMAND

Sunwest respectfully demands a trial by jury of any issue so triable.

**PRAYER FOR RELIEF**

**WHEREFORE**, Sunwest demands judgment as follows:

1.      That judgment be entered in favor of Sunwest;

2.      That Sunwest be awarded compensatory damages for costs and damages incurred as a result of the above-described actions in an amount to be determined at trial, but not less than the threshold amount for a Tier 3 case;

3.      That Sunwest be awarded a permanent injunction against Defendants, restraining them from further publishing the False Statements or any similar statements.

4.      That Sunwest be awarded post-judgment interest at the highest amount permitted by law;

5.      That Sunwest be awarded its costs and fees associated with bringing this case;

6.      That Sunwest be awarded punitive damages, as allowed by law, for Defendants' intentionally tortious conduct and reckless indifference for Sunwest's rights as may be determined at trial; and

7.      That the Court grant such other relief as it may deem just and proper.

DATED: October 18, 2024.

Respectfully submitted,

**KUNZLER BEAN & ADAMSON, PC**

*/s/ Ryan B. Bell*
Ryan B. Bell
Shelby Jaye Hughes

*Attorneys for Plaintiff Sunwest Bank*

Page 33 of 33

# EXHIBIT A

## to Complaint

10/4/24, 12:12 PM                                                    sunwest bank story - Google Search



sunwest bank story - Google Search

Heartland Signal

Report: Eric Hovde's bank sued for elder abuse and wrongful
death in a nursing home

Sunwest Bank, a Utah-based company owned by Wisconsin Republican Senate
candidate Eric Hovde, is the defendant in a lawsuit accusing a nursing home that is...

Apr 22, 2024

WPR

Hovde calls Baldwin 'rubber stamp' for Biden in RNC speech

Hovde stressed his Wisconsin roots and support for former President Donald Trump in
a speech to the Republican National Convention.

Jul 16, 2024

Orange County Business Journal

On the Move: Sunwest Bank Appoints Genevieve Hovde to
Board of Directors

Sunwest Bank, the bank built for entrepreneurs by entrepreneurs, welcomes Genevieve
Hovde, a Partner at BDT & MSD Partners, to its board.

Oct 30, 2023

1  2  3  4  5          Next

**Yalecrest, Salt Lake City, UT** - Based on your places (Home) - Update location

# EXHIBIT B

## to Complaint

Dan,

Please find the below response to your questions.

1. What was the purpose of Banco Azteca's transfer of $26.2 million in cash to Sunwest in December 2023? Did it have to do with Banco Azteca's overflowing U.S. cash reserves (per Bloomberg)? What was the Federal Reserve's role in this transfer? How long has Sunwest been a correspondent bank for Banco Azteca?

   The purpose of the Banco Azteca transfer is the repatriation of US dollars from solely consumer currency exchange transactions that occur at Banco Azteca, particularly related to US dollars that are generated from tourist activity. There are very strict limits on the amount that can be exchanged per month by each individual and controls on the documentation required for these transactions, specifically to prevent money laundering. US tourists that travel to Mexico spend US dollars in the economy and those dollars must eventually make their way back to the United States. The repatriation of US currency to the Federal Reserve Bank is a very important policy for the Federal Reserve Bank and US Government. Sunwest works in coordination with the Federal Reserve to vet these dollar shipments and each individual transaction related to the shipments including the personal information and identification of those individuals making the exchange. Further, all transactions are reviewed through the due diligence and assessment process by other government agencies such as the FDIC. To be clear, the largest facilitator of US Dollar wholesale banknote shipments from Mexico and Latin America is Bank of America, so this business line is not unique to Sunwest.

2. Why is Sunwest continuing to do business with Banco Azteca when other banks have cut ties with the bank because of risk and compliance concerns (per the Wall Street Journal)?

   Banco Azteca has numerous correspondent banking relationships in the US and around the world. There are two other banks that import bank notes in collaboration with the Federal Reserve from Banco Azteca. Further, they have multiple US partners in other business lines. We are not aware of any banks that have cut ties with Banco Azteca since the dated articles you are referencing. These articles are referencing a much broader de-risking of Latin America that occurred in the 2014-2016 timeline led by the large banks because of issues that happened with Citibank. The US Government, FINCEN, FDIC and Federal Reserve have changed policies to ensure this business can be conducted appropriately and compliantly to address the economic concerns and issues that were created by this broad de-risking.

   Sunwest has a very robust compliance program and vetting process to ensure there is no money laundering related to any foreign correspondent relationship. There is ongoing oversight of transaction level information by multiple government agencies (Federal Reserve, FDIC and FINCEN) to ensure there is no money laundering. The articles that are being referenced pertain to remittances which is a different business line than the wholesale banknote repatriation business conducted by Sunwest. We are not involved in the remittance business you are referencing.

3. Do you, as CEO of Sunwest, have concerns about allegations of Banco Azteca's money-laundering problems and possible links to Mexican cartels? (Links to stories in Reuters, the Yale Journal and other publications were provided in my last email.)

Sunwest has an incredibly strong compliance and anti-money laundering program which is vetted and takes this area very seriously. Sunwest conducts extensive ongoing due diligence of its clients, and all underly activities to prevent money laundering. Bank Secrecy Act (BSA), Anti-Money Laundering (AML), Know Your Customer (KYC) compliance are the most intensely scrutinized compliance areas in the banking system. Sunwest is a highly regulated bank and has multiple government agencies review the bank and its BSA/AML program annually, including a special exam of all of the foreign correspondent transactions you are referencing. There are not any concerns from the regulators or the Federal Reserve related to the transactions you are referencing and Sunwest works collaboratively with these government agencies to ensure no money laundering occurs. If Sunwest was in non-compliance or there were concerns by regulators, there would be enforcement actions taken and they would be made public. We take this responsibility very seriously because it protects America's banking system and there are strict penalties for non-compliance with these regulations. The repatriation of US dollars back to the United States from around the globe is a very important geopolitical policy and program for the Federal Reserve and the US Treasury to ensure the ongoing strength and use of US dollars for transactions.

In our prior phone call and in the information above, we have clearly outlined for you that the information and allegations you are referring to in this story are inaccurate. You are referencing dated articles, blog posts and other information that is speculative and presumptive, and then attempting to connect that activity to Sunwest Bank despite repeated attempts on our behalf to provide the actual facts that pertain to Sunwest. It is clear to us that you have malicious intent and a reckless disregard for the facts in this article because we have provided the actual facts to you, and your editors have decided to still proceed with the story and knowingly publish information that is not factual, and can negatively impact the reputation of Sunwest. The Federal Reserve and US Treasury will also not take kindly to an inaccurate article like this being written. In light of all of the above, you will be receiving a cease-and-desist letter from our attorneys in the next 24 hours and if you publish, the Bank will pursue a defamation lawsuit against your publication.

# **EXHIBIT C**

## **to Complaint**

Founded in 1852
by Sidney Davy Miller

# MILLER CANFIELD

Miller, Canfield, Paddock and Stone, P.L.C.
840 W. Long Lake Road, Suite 150
Troy, Michigan  48098
TEL (248) 879-2000
FAX (248) 879-2001
millercanfield.com

Gerald J. Gleeson II
TEL +1.248.267.3296
FAX +1.248.879.2001
E-MAIL gleeson@millercanfield.com

MICHIGAN
ILLINOIS
NEW YORK
OHIO
WASHINGTON, D.C.
CALIFORNIA
CANADA
MEXICO
POLAND
UKRAINE
QATAR

September 13, 2024

**_Via E-Mail and First Class Mail_**

Caren Bohan
Interim Editor in Chief
USA TODAY Newsroom
1575 I Street, N.W., Suite 350
Washington, DC 20005
cbohan@usatoday.com

Polly Grunfeld Sack
Chief Legal Counsel
Gannett Co., Inc.
1675 Broadway, 25th Floor
New York, NY 10019
psack@gannett.com

Mike Reed
Chief Executive Officer
Gannett Co., Inc.
1675 Broadway, 25th Floor
New York, NY 10019
mreed@gannett.com

Greg Borowski
Editor in Chief
The Milwaukee Journal Sentinel
333 West State Street
Milwaukee, WI 53203
greg.borowski@jrn.com

Re:    Sunwest Bank

Dear Ms. Bohan, Ms. Sack, Mr. Reed and Mr. Borowski:

It has come to the attention of Sunwest Bank (the "Bank") that USA Today Network is contemplating a story alleging that the Bank has engaged in criminal or other unlawful conduct. Any such allegations are false, defamatory and legally actionable. The Bank has already provided answers to the reporters that should be sufficient to negate any allegations of wrong-doing. The reporter's questions proffered to the Bank, and the Bank's responses are attached to this letter. If USA Today or the Milwaukee Journal Sentinel publishes any content containing such allegations, the Bank will immediately commence legal action to protect its reputation and vindicate itself.

No matter the sources relied upon by your reporters, there is no question that whatever information that has been conveyed to them is untrue. The reporters are referencing a conglomeration of dated press articles, international news articles of dubious origin, blog posts, and other information that is speculative and presumptive. It appears that your reporters seek to sully the Bank's reputation by innuendo, thus putting it in a false light. Your decision to publish unfounded allegations and speculation (in the face of the overarching regulatory framework and federal oversight of the Bank) will be understood to have been made with actual malice, and the

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

-2-                                                      September 13, 2024

Bank will prosecute its claims against USA Today to the full extent of the law.   Further, consider yourselves forewarned that the Bank will not limit its remedies to USA Today or the Milwaukee Journal Sentinel, but will seek damages from any individual involved in the creation or publication of false allegations involving the Bank.

Financial institutions survive based on their reputation, locally and nationally.   An unfounded attempt to connect the Bank to "Mexican cartels" and "money launderers" without any proof is beyond the pale and unbecoming of real journalists.  USA Today is better than this.

Because of USA Today's national circulation, the damages likely to be suffered by the Bank from such falsities will be catastrophic.  I strongly urge you to reconsider the publication of any allegations regarding the Bank unless USA Today and the Milwaukee Journal Sentinel are prepared and insured to reimburse the Bank for those damages.

Sincerely,

Miller, Canfield, Paddock and Stone, P.L.C.

By: _____
     Gerald J. Gleeson II

GJG/llr
42686690.2/088888.03382

# EXHIBIT D

## to Complaint

# milwaukee journal sentinel

ELECTIONS

# Bice: Democrats question Eric Hovde over his bank's $26M deal with a troubled Mexican bank



**Daniel Bice**
Milwaukee Journal Sentinel

Published 5:04 a.m. CT Sept. 19, 2024 | Updated 5:05 a.m. CT Sept. 19, 2024

**Banco Azteca**, the 10th largest financial institution in Mexico, has had its share of problems in recent years.

Accused in past news stories of having links to the Mexican drug cartel.

Dropped as a financial partner by some U.S. banks because of "risk and compliance concerns."

And now caught up in a Texas bribery scheme with an American congressman.

But **Sunwest Bank**, the Utah-based financial institution run by Republican U.S. Senate candidate **Eric Hovde**, doesn't mind doing business with it.

In December, Banco Azteca sent $26.2 million in cash to Sunwest on four airplane flights as part of a massive currency conversion called "repatriation," records show. Hovde, who is running against Democratic U.S. Sen. **Tammy Baldwin**, is chairman and CEO of Sunwest.

Now Democrats are questioning the deal, saying it gives voters a window into how Hovde runs his businesses by putting personal financial stakes above other issues.

**Arik Wolk**, spokesman of the Democratic Party, said Sunwest's transactions with Banco Azteca are "extraordinarily concerning," especially given the alleged past ties between Azteca and the drug cartel. He added, however, that Democrats were not suggesting Hovde or Sunwest had done anything illegal.

"Hovde is willing to do anything to enrich himself, even flying cash across the border for a bank suspected of working for criminal groups that are pouring deadly fentanyl into our state," Wolk claimed.

But Hovde, a 60-year-old bank and real estate mogul, is fighting back against the criticism.

He said Sunwest thoroughly reviewed the Banco Azteca deal, which he said involved U.S. dollars generated from tourist activity in Mexico. He said there are strict limits on the amount that can be exchanged per month by each individual at Mexican banks and controls on the documentation required for these transactions, specifically to prevent money laundering.

Everything was perfectly sound and legal, he said.

"Sunwest has an incredibly strong compliance and anti-money laundering program which is vetted and takes this area very seriously," Hovde said via email. "Sunwest conducts extensive ongoing due diligence of its clients, and all underlying activities to prevent money laundering."

Neither Hovde nor Sunwest have been accused of wrongdoing nor is there evidence that the funds from Banco Azteca were connected to cartel activity.

As recently as 2021, Banco Azteca had no correspondent banks in the U.S. with which it could transfer U.S. currency. But Hovde said Sunwest now is one of three banks that work, in collaboration with the Federal Reserve, with the Mexico City-based bank.

Hovde said many larger banks began "de-risking" a decade ago by cutting ties to Latin American banks after the federal government began clamping down on money laundering following some problems at **Citigroup**. That, he suggested, is now in the past.

The U.S. government and its regulatory agencies, he said, "have changed policies to ensure this business can be conducted appropriately and compliantly to address the economic concerns and issues that were created by this broad de-risking."

Over the past decade, several news accounts, including two by Reuters, have drawn links between **Banco Azteca** and Mexican gangs, which are the leading suppliers of cocaine, heroin, fentanyl and other illicit narcotics to the U.S.

In 2023, a Reuters reporter wrote that drug cartels are using remittances – money transfers favored by migrant workers – to send illicit earnings back to Mexico. Hovde said remittances

are "a different business line than the wholesale banknote repatriation business conducted by Sunwest."

The Reuters reporter said he witnessed five individuals on motorcycles collecting cash from people leaving branch offices of three banks, including Banco Azteca. Locals said these were couriers for the Sinaloa Cartel picking up drug money sent as remittances.

In a 2014 story, Reuters quoted a prominent anti-kidnapping activist saying Mexican gangs involved in kidnapping migrants ask for the money to be sent to Banco Azteca. Also, the **Yale Journal of International Affairs** reported that Banco Azteca was one of four banks that the Mexican cartel was using to process extortion payments.

Around the same time, U.S. regulators began looking into the widespread use of banks by the Mexican gangs to launder U.S. dollars.

In 2012, HSBC was hit with a $1.9 billion fine for its alleged role in laundering Mexican drug money. Not long after, **Citigroup** agreed agreed to pay $97.4 million after a lengthy federal investigation into its Mexican retail banking division, **Banamex USA**, over money-laundering allegations. Citi is in the midst of selling Banamex.

Also, the Financial Crimes Enforcement Network sent notices in 2015 warning banks of the risk that drug cartels were laundering money through correspondent accounts, according to the Wall Street Journal. Some big U.S. banks received a cautionary note from the Office of the Comptroller of the Currency about their Mexico banking activities.

Banco Azteca was not exempt from the scrutiny.

A little more than a decade ago, the U.S. Office of the Comptroller of the Currency investigated Banco Azteca's ties with its then-correspondent bank in the U.S., **Lone Star National Bank of Pharr**, and turned up money-laundering concerns. Repeatedly cited and fined, Lone Star soon ended its relationship with Banco Azteca.

Other financial institutions, including **Fifth Third Cincinnati** and **CBW Bank**, soon followed.

According to a May story in the **Wall Street Journal**, Banco Azteca has struggled doing business with U.S. banks since regulators began enforcing rules cracking down on money laundering from drug trafficking, kidnapping and extortion. Many U.S. banks have cut ties with Banco Azteca because of "risk and compliance concerns."

For years, that left Banco Azteca holding onto large sums of U.S. currency with no place to offload it.

The bank's problems came to a head earlier this year when a Texas congressman, Democratic U.S. Rep. **Henry Cuellar**, and his wife were charged with taking $236,390 in bribes from Banco Azteca, which was accused of trying to influence anti-money laundering legislation in the U.S. **Ricardo Salinas Pliego**, one of Mexico's wealthiest residents, is the head of **Grupo Salinas**, which owns Banco Azteca.

Cuellar said in a statement that he and his wife are "innocent of these allegations." Banco Azteca said in a post on X, formerly known as Twitter: "We want to reiterate that our operations are governed by the highest international compliance standards."

Asked about Banco Azteca's role in the federal indictment, Hovde was dismissive.

"Dan, once again your facts are wrong," Hovde said. "Go read the indictment. There is no mention of Carlos Salinas Pliego in the indictment, and the Wall Street Journal states that neither Banco Azteca or Carlos Salinas Pliego were charged with any wrong."

Indeed, the indictment doesn't name Banco Azteca, and neither it nor Salinas Pliego were charged with any crime. But many news outlets quickly realized that it was the anonymous financial institution accused of bribing Cuellar. Several outlets, such as **Bloomberg**, said Azteca was implicated but not charged in the case in a bid to "loosen U.S. rules regarding the shipments of U.S. currency to banks."

Here is the headline in the Wall Street Journal: "Combative billionaire's bank accused of bribing a Texas Democrat: U.S. federal indictment of congressman alleges payments from billionaire Richard Salinas Pliego's Banco Azteca were used to influence legislation."

Reached last week, **Luciano N. Pascoe**, a spokesman for Grupo Salinas, acknowledged that the federal government's anti-money laundering regulations have cut the number of correspondent banks that Latin American financial institutions have in the U.S. But he said Banco Azteca now has built up a "solid network" of such relationships.

Pascoe said Banco Azteca goes beyond the "standard regulatory requirements in our efforts to combat money laundering, terrorist financing and fraud."

He said the transactions with Sunwest were part of the bank's standard method of "repatriating" U.S. dollars it has received to an American financial institution. Sunwest is

permitted to charge fees for the service.

The transactions, he added, were "legal, overseen by regulators, and based on the same principles of ethics, security, fraud prevention, and transparency that govern the rest of our business relationships with national and international banks."

Pascoe criticized Wisconsin Democrats for making an issue of the matter.

"It is disgraceful to use prejudicial and out-of-context information to generate disinformation and maliciously accuse third parties to gain political advantage," Pascoe said.

*Contact Daniel Bice at (414) 313-6684 or dbice@jrn.com. Follow him on X at @DanielBice or on Facebook at fb.me/daniel.bice.*