# EXHIBIT B

**to Plaintiff's Motion for Leave
to File First Amended Complaint**

Ryan B. Bell (9956)
Shelby Jaye Hughes (16690)
**KUNZLER BEAN & ADAMSON, PC**
50 W. Broadway, 10th Floor
Salt Lake City, Utah 84101
Telephone: (801) 994-4646
Facsimile: (801) 758-7436
rbell@kba.law
shughes@kba.law

*Attorneys for Plaintiff Sunwest Bank*

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SUNWEST BANK, a Utah corporation,<br>　　　Plaintiff,<br><br>v.<br><br>GANNETT CO., INC., a Delaware corporation, and JOURNAL SENTINEL INC., a Wisconsin corporation;<br><br>　　　Defendants. | **FIRST AMENDED COMPLAINT**<br><br>**(JURY DEMANDED)**<br><br>Case No.: 2:24-cv-00876-DBB-JCB<br><br>District Judge David Barlow<br>Magistrate Judge Jared C. Bennett |

Plaintiff Sunwest Bank ("Plaintiff" or "Sunwest"), by and through its above counsel of record, hereby complains and alleges against Defendants Gannett Co., Inc. ("Gannett") and Journal Sentinel Inc. ("Journal Sentinel") (collectively, "Defendants") as follows:

## <u>INTRODUCTORY STATEMENT</u>

As a long-running newspaper within a national journalistic network, the Milwaukee Journal Sentinel has a responsibility to the public to publish the truth, and to filter out of its pages

the lies and invective that bad actors wish to disseminate for their own purposes. The paper badly shirked this core responsibility, and failed the public, when it published a story about Sunwest Bank on September 19, 2024. The article appears intended as a political hit piece against a candidate for the United States Senate. But the Journal Sentinel's inclusion of Sunwest Bank as a central figure in the narrative, surrounded by numerous falsehoods and misleading framing, moved the article out of the realm of politics and into the wrongful defamation of a well-regarded, highly sophisticated, private banking institution. What is worse, the paper credulously printed the inflammatory statements of a political operative, again, trying to harm a political candidate, but pulling Sunwest directly into the crossfire.

The Journal Sentinel did not simply re-print these accusations as the groundless meanderings of a political hired gun. It gave its imprimatur to the accusations, leaving the strong impression that Sunwest deals unconscionably with corrupt criminal institutions. But Defendants knew better. Before the piece was published, Sunwest explained in great detail that the accusations were false and that it had carefully considered and vetted the transactions and banking customer at issue. The paper published its piece regardless and has left it in circulation online to the current day.

Sunwest has suffered damages as a result. Management at Sunwest now receives questions from existing and prospective customers, as well as employees, asking about the article and the alleged links with criminal organizations and money laundering. These are only the examples that Sunwest has heard about from its customers, making it likely there are numerous others who have heard the inflammatory allegations. The wide circulation of these false allegations has created existing reputational damage and unknown future impacts to Sunwest's stellar reputation. These

effects are continuing and will certainly cause future harm as well, particularly if they go uncorrected.

Defendants were warned that their story was false. They published it anyway and have caused harm to a highly reputable bank as a result. By this Complaint, Sunwest asks this Court to hold Defendants accountable for these wrongful acts to the full extent of Utah law.

## PARTIES, JURISDICTION, AND VENUE

1.     Sunwest Bank is a Utah corporation with its principal place of business in Salt Lake County, Utah, and located at 10011 Centennial Parkway, Sandy, Utah, 84070.

2.     Many of Sunwest Bank's customers reside in Utah.

3.     Sunwest Bank's servers (that host its email and internet services) are located in Utah.

4.     A substantial portion of Sunwest Bank's employees and agents are located and reside in Utah.

5.     Journal Sentinel Inc. is a Wisconsin corporation with its principal office located at 1675 Broadway, 23rd Floor, New York, New York 10019.

6.     Journal Sentinel Inc. publishes a general circulation newspaper distributed in Milwaukee, Wisconsin and surrounding areas.

7.     Journal Sentinel Inc. also publishes its articles through its website https://www.jsonline.com/ and through its "eNewspaper."

8.     Subscriptions to the Journal Sentinel Inc. may be purchased from any location via the paper's website. On information and belief, Utah residents visit https://www.jsonline.com/ as well as subscribe to the eNewspaper.

9.    Like many news publications today, Journal Sentinel Inc. is part of a broader news distribution conglomerate, Gannett Co., Inc., which is commonly referred to as the USA Today Network.

10.    Gannett Co., Inc. owns and operates the Journal Sentinel Inc., as well as USA Today, which is a general circulation newspaper distributed nationally, including in Utah, and The Spectrum, a general circulation newspaper distributed in St. George, Utah and surrounding areas.

11.    The Journal Sentinel Inc., like The Spectrum, holds itself out to be "Part of the USA TODAY Network."

12.    As part of its ownership, operations, and control over Journal Sentinel Inc., Gannett Co., Inc. directs the majority of the Journal Sentinel Inc.'s disclosed information in its footer section on the https://www.jsonline.com/ webpage to USA Today and/or Gannett Co., Inc.'s policies, terms, and other business material.

13.    Specifically, the Journal Sentinel Inc.'s:

    a.    "Our Ethical Principles" link directs to a webpage entitled "USA TODAY NETWORK Principles of Ethical Conduct For Newsrooms."

    b.    "Accessibility Support" link directs to USA Today's "Accessibility Support" policy.

    c.    "Responsible Disclosure" link directs to Gannett Co., Inc.'s Responsible Disclosure Program.

    d.    "Privacy Policy" link directs to "GANNETT PRIVACY POLICY."

    e.    "Careers" link directs to "Careers - Gannett."

f. "Contact Us" page provides the following statement as a caption to the header: "This site is part of the USA TODAY Network and is owned and operated by Gannett Co., Inc."

g. "Support Local Businesses" link directs to USA Today's "Support Local Business" page.

h. "Advertising Acceptance Policy" link directs to an ADVERTISING SERVICES AGREEMENT copyrighted by Gannett Co., Inc.

i. "Milwaukee Journal Sentinel Store" and "Shopping" links both direct to merchandise pages that are controlled by the web domains "usatodaystore.com" and "usatoday.com," respectively.

j. "Licensing and Reprints" link directs to USA Today Network's "Licensing and Reprints" page.

k. "Education" link directs to "GANNETT MEDIA EDUCATION"

l. "10Best" link directs to "USA TODAY 10Best"

m. "LocaliQ Digital Marketing Solutions" link directs to LocaliQ.com, which is run by Gannett Co., Inc.

14. Additionally, Gannett Co., Inc. has copyrighted Journal Sentinel Inc.'s Terms of Service and Subscription Terms & Conditions for Journal Sentinel.

15. Accordingly, Gannett Co., Inc. enjoys substantial control over both Journal Sentinel Inc. and the Journal Sentinel Inc. newspaper, and/or separation between these entities is so vague or insubstantial as to make Gannett Co., Inc. legally responsible for the statements of Journal Sentinel Inc. and the Journal Sentinel Inc. newspaper.

16.     Gannett Co., Inc. is a Delaware corporation with its principal place of business in New York County, New York, at 1675 Broadway, 23rd Floor, New York, New York 10019.

17.     This Court has personal jurisdiction over Gannett Co., Inc. in this matter because Gannett Co., Inc. caused injury in Utah and because Gannett Co., Inc. conducts substantial business in Utah through its distributions of its publications of the USA Today Network, which is so continuous and systematic as to render it essentially at home in this forum.

18.     Gannett Co., Inc. is also subject to Utah's jurisdiction because its USA Today Network reporter, Daniel Bice, reached into Utah when he contacted Sunwest Bank, a Utah business, in September 2024 to discuss various false assertions about Sunwest Bank ("the False Statements"), which are detailed below, that Gannett Co., Inc. anticipated publishing in its USA Today Network.

19.     During those communications, Sunwest Bank notified Mr. Bice that it was a Utah corporation.

20.     Sunwest Bank exchanged correspondence with Sunwest Bank representatives via email accounts based on servers located in Utah.

21.     Additionally, at least one of Sunwest Bank's representatives was located in Utah while conferring, investigating, and aiding in the response to the USA Today Network/Journal Sentinel Inc. reporter's inquiries.

22.     In these communications, the USA Today Network/Journal Sentinel Inc. reporter acknowledged the prospect of litigation if any USA Today Network newspaper published the False Statements, so it should have anticipated being haled into court in Utah.

23.     This Court also has personal jurisdiction over Journal Sentinel Inc. because Journal Sentinel Inc. conducted the following acts that created a close nexus between Utah and the underlying controversy of this litigation:

a.      As outlined above, the Journal Sentinel Inc.'s agent made contacts with Utah when Gannett Co., Inc.'s USA Today Network reporter reached into Utah to get comments and information about Sunwest Bank to publish in the USA Today Network.

b.      In these communications, Sunwest Bank told Defendants that it was a Utah Corporation and the USA Today Network reporter, acting as the Journal Sentinel Inc.'s agent, acknowledged the prospect of litigation if any USA Today Network newspaper published the False Statements, specifically identifying the Journal Sentinel Inc. Accordingly, the Journal Sentinel Inc. should have anticipated being haled into a court in Utah in the event it published those False Statements.

c.      The Journal Sentinel Inc., despite knowing the falsity, published the False Statements, which were distributed throughout the country through its subscriptions, webpage, and eNewspaper, including to those located and residing in Utah.

d.      Indeed, Sunwest Bank's Utah customers have contacted its Utah headquarters and staff to discuss their concerns about the accusations of Sunwest Bank described in the Journal Sentinel Inc.'s False Statements.

e.      Thus, these False Statements published by Journal Sentinel Inc. harm not only Sunwest Bank but also the readers that reside in Utah.

f.      In fact, a search conducted from within Utah on Google's 'News' search tool using the search terms "Sunwest Bank" garners as its very top result the same

defamatory story published by the Journal Sentinel Inc. that is at the heart of this dispute. *See* Google News Search Result, attached hereto as **Exhibit A**.

24.     In other words, Gannett Co. Inc./Journal Sentinel Inc. reached into Utah and the resulting activities forming the basis of this litigation took place in Utah, had effects felt by the broader forum, and are therefore subject to Utah's jurisdiction.

25.     Defendants are subject to the jurisdiction of the courts of Utah under Utah Code § 78A-5-102 and § 78B-3-205 (1)-(2); to wit: as outlined above, Defendants' publication of the False Statements affects persons and businesses (including, without limitation, Utah readers, Sunwest Bank, and Sunwest Bank's Utah customers) within Utah.

26.     Venue is proper in this Court under Utah Code § 78B-3a-201(1)(a), (2) because Sunwest Bank's injuries occurred in Salt Lake County and thus, all or part of the claims in this action arose in Salt Lake County and/or because Sunwest Bank has its principal place of business in Salt Lake County and regularly conducts business in Salt Lake County.

## FACTUAL ALLEGATIONS

### Sunwest Bank

27.     Sunwest is a state-chartered, Utah-based commercial bank in the United States providing business and personal banking services in Utah, as well as in Arizona, California, Florida, Idaho, and elsewhere.

28.     Sunwest specializes in working with small-to-medium businesses, entrepreneurs, privately held corporations, family offices, real estate developers, and other investors.

29.     Sunwest also provides correspondent banking services to international banks throughout the Americas.

30. Sunwest has grown from a small, local bank to a regional bank over the past 10 years.

31. Sunwest's growth has been possible because of its excellent reputation among businesses and the public.

32. Like other financial institutions, Sunwest survives on its reputation, both locally and nationally.

33. The Federal Deposit Insurance Corporation ("FDIC") and the Utah Department of Financial Institutions ("UDFI"), among others, regulate Sunwest's banking services and operations.

### *FCB Repatriation Program Background*

34. One of the many services offered by Sunwest is foreign correspondent banking ("FCB").

35. Fundamentally, FCB is a formal agreement or relationship between a U.S. bank (correspondent bank) and a foreign bank whereby the U.S. bank provides banking or payment services.

36. These agreements are necessary to facilitate international financial transactions— including international trade, humanitarian efforts, and global tourism—because there is no formal central network that banks can use to move funds across borders.

37. FCB relationships are governed and overseen by Federal law, which imposes stringent anti-money laundering requirements to prevent the kind of wrongdoing the Journal Sentinel accused Sunwest of committing.

38.     Federal law requires Sunwest to maintain a robust Bank Secrecy Act ("BSA") and anti-money-laundering ("AML") program, which must, at minimum, include designating a compliance officer, implementing ongoing training programs, establishing internal controls, and permitting independent audits. *See* 31 U.S.C. § 5318(h).

39.     U.S. banks must also comply with "know your customer" regulations, which requires them to develop customer profiles, assess risk of fraud and acquire additional information from higher-risk customers, and conduct ongoing monitoring to identify and report suspicious transactions. *See*, *e.g.*, 31 C.F.R. § 1020.210.

40.     U.S. banks must also comply with regulations imposed by the Office of Foreign Assets Control of the Department of Treasury. They must screen potential customers using the Specially Designated Nationals list and other similar sanction programs that target foreign persons, governments, sectors, and geographic locations.

41.     Sunwest takes its compliance duties seriously, and federal regulators have never raised any concerns about money laundering during their annual review of Sunwest's FCB services.

42.     This is largely because Sunwest maintains an AML program that exceeds the federal requirements.

43.     To start, Sunwest has dedicated a risk-management division for its FCB relationships that specializes in handling the unique complexities of the business line. Sunwest has developed and continually enhances a proprietary risk-management system for FCB services that monitors the foreign respondent bank activity, including the underlying cash transactions, to identify and prevent financial crimes. Sunwest's due diligence process involves a detailed risk

review of each foreign respondent bank, including an assessment of the country's risk profile; its financial and anti-money-laundering laws; the foreign bank's operations, products, services, and controls for financial crimes; and the foreign bank's customer base and sources of funds.

44.     Sunwest generally requires each foreign respondent bank to submit an annual independent audit report, which must detail its anti-money-laundering program, including its system for monitoring currency exports.

45.     Sunwest's compliance programs are reviewed annually by the FDIC, the UDFI, the Federal Reserve, and multiple independent financial audit firms.

46.     Sunwest consistently obtained satisfactory results from these reviews.

47.     One of the FCB services that Sunwest provides is repatriation of U.S. currency, which brings back into the U.S. physical USD banknotes that have been spent abroad, primarily related to tourism.

48.     This is an important function of the international currency system, as it helps maintain a stable global flow of funds since a foreign bank cannot independently return USD banknotes to the Federal Reserve itself.

49.     Because USD banknotes belong to the federal government, the Federal Reserve created the FCB's repatriation program to partner with U.S. banks to assist in facilitating the return of USD banknotes.

50.     All varieties of banks provide repatriation services. Bank of America, for example, controls most of the market for repatriation of USD banknotes from Mexico.

51.     Under the FCB repatriation program, the foreign bank ships the bulk USD banknotes directly to a branch of the U.S. Federal Reserve, which usually means the foreign bank

sends the money by commercial flight to Miami or Los Angeles, and from there by armored car directly to the local branch of the U.S. Federal Reserve.

52. The USD banknotes, or any other U.S. currency, are not shipped to Sunwest itself.

53. Before Sunwest can facilitate any repatriation transaction for a foreign bank, it must secure authorization from the Federal Reserve. It must provide details about the foreign respondent bank and enter into a formal compliance agreement with the Federal Reserve.

54. Sunwest vets repatriation requests using its proprietary risk management system, which checks for suspicious users, amounts, timing of deposits, etc., to ensure that the cash does not originate from criminal or sanctioned sources.

55. The Federal Reserve also reviews whether the appropriate safeguards are in place at the U.S. bank via its BSA, Office of Foreign Assets Control, and anti-bribery/corruption ("ABC") programs before agreeing to accept repatriated funds.

56. Upon receipt, the Federal Reserve then credits the appropriate U.S. bank's account for the equivalent amount of USD banknotes and only then, upon confirmation of the funds, would the U.S. bank credit the foreign bank's U.S. bank account.

57. The process described in paragraphs 46–55 above shall be generally referred to as "Repatriation."

58. The Repatriation program requires participants to go through rigorous efforts to ensure that no money laundering or other financial crimes take place.

59. Such requirements include, without limitation:

a.      Maintaining a robust BSA and AML program, which must, at minimum, include designating a BSA officer, implementing ongoing training programs, and performing independent audits. *See* 31 U.S.C. § 5318(h).

b.      Fulfilling Customer Due Diligence Requirements for Financial Institutions (the "CDD Rule"). These requirements were published on May 11, 2016, and amended on September 29, 2017, which amended the BSA. The CDD Rule requires that U.S. banks understand the nature and purpose of customer relationships for the purpose of developing a customer risk profile and conducting ongoing monitoring in order to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information. *See* 31 CFR §§ 1020.210.

c.      Assessing the risk profile of the foreign bank to determine, on the basis of risk, whether a customer presents a higher risk profile and, accordingly, to collect more information to better understand the customer relationship. *See* August 3, 2020 FinCEN guidance.

d.      Conducting due diligence, in some cases, enhanced due diligence, of correspondent accounts established or maintained for foreign financial institutions. *See* § 312 of the USA PATRIOT Act.

e.      Oversight by the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury, which administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities

related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy, or economy of the United States.

      f.      Complying with the various OFAC regulations, including the requirements to search for individuals added to the Specially Designated Nationals ("SDN") list, and the different sanction programs that target other foreign persons, governments, sectors, and geographic locations.

      g.      Conducting and maintaining adequate due diligence on correspondent bank accounts held on behalf of foreign banks and ensuring those due-diligence systems are "reasonably designed to detect and report instances of money laundering through those accounts." 31 U.S.C. § 5318(i).

60.      Finally, to ensure compliance and encourage that U.S. banks prevent money laundering and other financial crimes, as a matter of federal law, the U.S. correspondent bank participating in the FCB programs can be held liable for violations of anti-money laundering or other financial-crime laws committed by their foreign correspondent bank.

### Sunwest's FCB Compliance and Diligence to Prevent Financial Crimes

61.      Sunwest conducts due diligence and analyzes risks pertaining to foreign jurisdictions, foreign banks, and the source of funds, which enables them to make risk-based decisions and creates a safer financial environment for movement of funds.

62.      As part of its Repatriation due diligence on foreign bank clients, Sunwest reviews the foreign bank's anti-money laundering and financial crimes ("AML") programs, reviews their AML audit reports and cash reports, conducts site visits, reviews their AML internal controls, AML training, and AML staff, among other factors to identify if there are any systemic material

deficiencies or risks and to determine if it is within its risk appetite and has adequate controls to identify, mitigate, and report suspicious activity to U.S. law enforcement.

63. Moreover, Sunwest has implemented a robust AML program that exceeds the requirements of U.S. regulations related to financial crimes, including, but not limited to, the BSA, sanctions regulations established by the OFAC, and regulations established to combat bribery and corruption.

64. Sunwest also has a dedicated risk management division for foreign correspondent banking relationships given the risk profile and complexity of the business line.

65. Sunwest has developed and continually enhances its proprietary risk management system for its FCB services, which assists Sunwest in monitoring these relationships and the underlying exchange transactions to identify and prevent financial crimes from occurring.

66. Sunwest completes this analysis prior to a foreign bank shipping U.S. banknotes to the Federal Reserve.

67. Sunwest's due diligence process involves an ongoing detailed risk review of each foreign correspondent bank, including an assessment of the country's risk profile, financial and anti-money laundering laws, the foreign correspondent bank's operations, products, services, and controls for financial crimes.

68. As required by BSA, OFAC, and its own internal policies, Sunwest regularly reviews the systems that its Repatriation partners, including Banco Azteca, has in place to prevent money laundering and other financial crimes and to ensure that its Repatriation partners' systems – including Banco Azteca's systems – are sufficient and compliant.

69.     Sunwest also vets Repatriation requests using a sophisticated proprietary risk management system to ensure that the cash does not originate from criminal or unsanctioned sources.

70.     Sunwest's system regularly analyzes transactions between the foreign bank and their clients that represent the source of funds.

71.     Sunwest's system also evaluates those individuals against sanctioned persons and jurisdictions.

### *Mexico's Efforts to Thwart Laundering of U.S. Currency*

72.     The government of Mexico has taken significant steps to combat money laundering.

73.     In addition to having strict oversight over its financial industry and banks, Mexico has also established limits to how many USD banknotes a person can exchange at any Mexican bank.

74.     For example, non-clients cannot exchange more than $300 per day or $1,500 per month. To exchange U.S. currency, they must provide their national identification card, and that information is scanned, extracted, and produced to Sunwest. Clients cannot exchange more than $4,000 per month. To become a client, a person must provide significantly more information, including employment details, sources of income, and expected activity information. All customers must also scan their fingerprint.

75.     Mexican banks must also verify the identities of the individuals, conduct various levels of due diligence, and screen the names against global sanction lists, including the U.S.'s sanction lists.

*Banco Azteca's Efforts to Prevent Money Laundering and Other Financial Crimes*

76.     Banco Azteca, which is the 11th largest bank in Mexico, has multiple FCB relationships in the United States and internationally—not just with Sunwest.

77.     Banco Azteca has comprehensive systems that employ real-time technology to prevent and detect financial crimes, including money laundering, at the macro and micro levels.

78.     As required by Mexican regulations, Banco Azteca limits customer and non-customer daily and monthly deposits and withdrawals; checks global sanction lists before permitting an individual to conduct any type of transaction within its institution; and employs sophisticated real-time technology to identify money laundering patterns in cash transactions and in their other services.

79.     Banco Azteca's system also includes scanning, storing, and using identities of the individuals who exchange U.S. dollars through Banco Azteca's national identification cards in order to generate reports that are provided to Sunwest.

80.     Banco Azteca collects additional due diligence regarding individuals who exchange U.S. dollars through Banco Azteca such as verifying employment, source of income, and expected activity information.

81.     Banco Azteca employs sophisticated real-time technology to identify money laundering patterns in cash transactions, as well as in their other services. The technology monitors activity by branch and region based on expected tourism and exchange activity. The system also checks for patterns and red flags in individual transactions.

82.     Each cashier has an alarm button to notify the compliance department of any suspicious cash transaction.

83.     Banco Azteca collaborates with U.S. law enforcement officials to share new money laundering typologies and patterns it identifies through its anti-money-laundering program.

84.     Banco Azteca has additionally implemented blockchain technology that contains an incorruptible trail of every cash transaction.

85.     Banco Azteca annually has an AML audit to review its Repatriation program, which also analyzes its cash export process.

86.     Banco Azteca also collaborates with U.S. law enforcement officials to share new money laundering typologies and patterns it identifies through its AML program.

87.     Banco Azteca has consistently obtained satisfactory AML audits and has not been subject to enforcement actions from its banking regulator.

### *Sunwest's FCB Repatriation Work with Banco Azteca*

88.     As do many other reputable U.S. banks, Sunwest provides FCB services to banks in Mexico.

89.     Specifically, Sunwest provides Repatriation services to Banco Azteca, as well as ancillary wire transfer services for U.S. payments related to the foreign bank's ordinary vendors or suppliers of services.

90.     In doing so, Sunwest considers its legal requirements and its robust compliance and prevention policies among its very highest priorities. It has a zero-tolerance threshold for any financial crimes occurring in connection with its services.

91.     In addition to complying with the federal rules, regulations, and laws outlined above, Sunwest also:

a.      Analyzes samples of the national identification cards Banco Azteca collects on an ongoing basis to ensure that none of those funding individuals are not known or suspected money launderers or complicit in financial crimes; and

b.      Requires Banco Azteca to regularly provide Sunwest with its audits (all of which are conducted by a U.S. audit firm) analyzing its AML and Repatriation program, which includes a list of the sources of funds of every cash transaction conducted during the audit period and a review of its AML and financial-crimes prevention programs.

92.     Based on all the due diligence conducted by Sunwest, Banco Azteca has maintained consistently high standards in its fight against money laundering and drug cartels.

93.     Sunwest's Repatriation programs (including its relationship with Banco Azteca) are reviewed annually by the FDIC, the UDFI, the Federal Reserve, and multiple independent financial audit firms, including submitting each of its Foreign Correspondent Banks (including Banco Azteca) to review conducted by an independent U.S. financial audit firm.

94.     Sunwest is transparent about the FCB services it provides to Banco Azteca, which inherently requires that the FDIC, the UDFI, the Federal Reserve, and multiple independent financial audit firms review the audit documentation provided by Banco Azteca.

95.     Put simply, Sunwest's and Banco Azteca's Repatriation relationship and transactions are closely overseen and scrutinized by the U.S. federal government and multiple regulatory agencies.

96.     Sunwest has consistently obtained satisfactory results from its reviews and audits, including those related to its Repatriation programs.

97. Sunwest has never faced an enforcement action related to its Repatriation services or any violation of anti-money laundering or financial-crimes laws.

98. And, if Banco Azteca were engaged in money laundering or other financial crimes, there would have been a public enforcement action against Sunwest.

***Gannett and Journal Sentinel's Publication of the False Statements***

99. At some point before September 19, 2024, Arik Wolk, the Rapid Response Director for the Democratic Party of Wisconsin, provided several false statements about Sunwest to Daniel Bice, a USA Today Network journalist.

100. Upon learning that Defendants contemplated publishing a story premised on Mr. Wolk's false statements about Sunwest, Sunwest provided a detailed outline of the Foreign Correspondent Banking platform and rigorous compliance program to expressly notify Defendants of the falsity of the statements.

101. Mr. Bice then contacted Sunwest in September 2024 requesting Sunwest's comments and response to Mr. Wolk's statements by phone and email.

102. Sunwest, in turn, fully demonstrated the falsity of Mr. Wolk's statements and implications through email and phone call conversations. *See* 2024.09.13 Responses to Wolk's Questions attached hereto as **Exhibit B**.

103. Specifically, Sunwest explained FCB services and the repatriation of USD banknotes through the Federal Reserve processes, including, without limitation, the details described in paragraphs 46-55 above.

104.    Sunwest further explained its efforts to ensure that it did not participate in or facilitate money laundering or other financial crimes, particularly in providing FCB services, including, without limitation, the details described in described in paragraphs 57-70 above.

105.    Sunwest also explained that providing FCB services is a highly regulated industry that is overseen by numerous government agencies, including the Federal Reserve, FDIC, and FINCEN to ensure that no money laundering or other financial crimes are taking place, which included details described in paragraphs 57-70 above.

106.    Moreover, Sunwest further debunked other unsubstantiated articles that Defendants had cited in support of Mr. Wolk's statements by clarifying that those articles discussed a "remittance" program, which was distinct and separate from the repatriation services Sunwest provides.

107.    Sunwest explained that it had never provided "remittance" services, nor had it participated in a "remittance" program.

108.    Sunwest further notified Defendants on September 13, 2024, that Mr. Wolk's statements, including those accusing Sunwest of engaging in criminal or other unlawful conduct consisted of nothing more than "unfounded allegations and speculation," particularly given the discredited information the accusations relied upon and the broad scope of "overarching regulatory framework and federal oversight" over Sunwest's FCB programs. *See* September 13, 2024 Letter attached hereto as **Exhibit C**.

109.    In light of the accusations being exposed as groundless, Sunwest urged Defendants to proceed cautiously as the publication of any refuted allegations would be understood to have

been done with intent to harm Sunwest's reputation. Sunwest warned that it would seek judicial intervention in the event of publication. *See id*.

110.     Gannett and Journal Sentinel disregarded these clear indications of the falsity of Mr. Wolk's statements and of the story put together by its reporter, Mr. Bice.

111.     On September 19, 2024, Journal Sentinel published and Gannett caused and permitted the Journal Sentinel to publish an article titled "Democrats Question Eric Hovde over His Bank's $26M Deal with a Troubled Mexican Bank" by Daniel Bice (the "Article"). The Article is attached hereto as **Exhibit D**.

112.     The Article states or implies numerous False Statements about Sunwest.

113.     Those False Statements include, without limitation, the following statements and implications:

      a.     "Banco Azteca…has had its share of problems in recent years. Accused in past news stories of having links to the Mexican drug cartel."

      b.     Banco Azteca has been "Dropped as a financial partner by some U.S. banks because of 'risk and compliance concerns.'"

      c.     Banco Azteca is "now caught up in a Texas bribery scheme with an American congressman."

      d.     Sunwest "doesn't mind doing business with [Banco Azteca]" and, implied, is knowingly doing business with a Mexican bank linked to drug cartels that has risk and compliance concerns, is involved in bribery schemes, and is otherwise involved in nefarious and illicit financial dealings.

e.       Banco Azteca, as part of its relationship with Sunwest, "sent $26.2 million in cash to [Sunwest] on four airplane flights."

f.       "[Sunwest's] transactions with Banco Azteca are 'extraordinarily concerning,' especially given the alleged past ties between Azteca and the drug cartel."

g.       Sunwest's representatives were "'flying cash across the border for a bank suspected of working for criminal groups that are pouring deadly fentanyl into our state,'" and Sunwest is thus responsible for trafficking in fentanyl and other crimes associated with criminal groups, such as money laundering, importing and distributing narcotics, and kidnapping.

h.       Sunwest is accepting the repatriation of U.S. dollars through the Federal Reserve in an inappropriate and illegal scheme.

i.       "[A]s recent as 2021, Banco Azteca had no correspondent banks in the U.S. with which it could transfer U.S. currency," and Sunwest is thus the only correspondent bank that Banco Azteca sends cash to.

j.       Sunwest is in a relationship with a bank with links, ties, or close relations with Mexican cartels.

k.       Sunwest is operating in a nefarious, illegal manner. Indeed, a reasonable person would conclude that the statements—that Banco Azteca is a "bank linked to Mexican drug cartel" and "Multiple U.S. banks have cut ties with Banco Azteca"—indicate that Sunwest is breaking the law by providing correspondent banking services to Banco Azteca.

114. The Article also includes a quote from Mr. Wolk stating that Eric Hovde, who is Sunwest's CEO, "will do anything to enrich himself," making the very strong, intentional implication that the actions of Sunwest were criminal and/or improper.

### *The Statements in the Article Are False*

115. The Article quotes dated articles, blog posts, and other information as fact when the contents of those sources are highly speculative and outdated, while also conflating remittance business with the FCB services and contracts associated with Sunwest.

116. The Article implies that Sunwest has acted improperly, despite Sunwest previously providing extensive answers and facts to outline its legitimate business and negate their concerns.

117. As articulated to Defendants and herein, the Article, the False Statements, and implications arising therefrom, are false, and Sunwest provided Defendants with copious amounts of support proving that the Article, the False Statements, and implications arising therefrom were untrue and grossly misleading.

118. Based on the information provided to Defendants prior to publishing the Article, which includes the information described above, Defendants knew that the False Statements were false and misleading.

119. Furthermore, had Defendants undertaken reasonable journalistic due diligence, Defendants would have reasonably appreciated there was no basis for the False Statements because they would have realized that Sunwest carefully complies with federal anti-money laundering laws and regulations.

120.     The False Statements and implications arising from the Article regarding Sunwest are, at minimum, recklessly false because they contradict publicly available information about Sunwest's compliance with federal anti-money laundering laws.

121.     Even the information cited and relied upon in the Article does not support the claim that Banco Azteca is knowingly providing money-laundering services to Mexican drug cartels (those articles and blogs explain that drug cartels are trying to use remittances (not Repatriation programs) to send drug proceeds back to Mexico. And, even still, those articles and blogs note that Mexican banks, including Banco Azteca specifically, are actively policing remittances to stop this practice).

122.     The Article states that "several news accounts" from the "last decade" have been published which "have drawn links between Banco Azteca and Mexican gangs, which are the leading suppliers of cocaine, heroin, fentanyl and other illicit narcotics to the U.S."

123.     A review of the stories the Article cites show that this is a dramatic overstatement.

124.     The first story cited, a Reuters article from 2023, states only that a reporter in a small town in Mexico saw five people enter branches of *three* different banks – only one of which was a Banco Azteca branch – withdraw money, and then give it to others who were thought to be couriers for criminal organizations. The idea that a person was seen leaving one branch of a very large bank in a small town and giving money to someone thought to be affiliated with a criminal organization falls laughably short of drawing "links between Banco Azteca and Mexican gangs."

125.     The Article also cites a story from the Yale Journal of International Affairs reporting "that Banco Azteca was one of four banks that the Mexican cartel was using to process extortion payments." This distorts the findings of that publication, which actually lists *ten* different

financial institutions that had received payments relating to extortion, and which are not linked in the story to particular cartel activity. And the reported data are from 2008-2011, well outside the range of any cartel links in the last decade. The Article discloses neither the old date of the Yale Journal piece nor the even older provenance of this data.

126.    The Article also cites a May 2024 Wall Street Journal story for the notion that "[m]any U.S. banks have cut ties with Banco Azteca because of 'risk and compliance concerns.'" This summary distorts the quoted story to give the impression that multiple banks cut ties with Banco Azteca because they were concerned it posed some special risk. On the contrary, the story states that U.S. banks cut ties because of new tighter regulations, and thus had "risk and compliance concerns *linked to those regulations,*" not specific to Banco Azteca.

127.    The final story, an old piece from 2014, only states that kidnappers have sought to deposit their money at Banco Azteca.

128.    Overall, the stories cited do not give substantial support to the notion that multiple reported pieces over the last decade have shown "links" between Banco Azteca and Mexican gangs. This statement is false and damaging.

129.    The statement in the Article that Banco Azteca "sent $26.2 million in cash to Sunwest on four airplane flights" is also false. The cash was sent not *to* Sunwest, but to a branch of the United States Federal Reserve. Had the Article stated the truth – that the cash was flown directly to the Federal Reserve, the message would have been innocuous, instead of the damaging effect of the Article's printed characterization.

130.    The Article's statement that as recently as 2021, Banco Azteca had no correspondent banks in the U.S. with which it could transfer U.S. currency," and similar

statements, are also false. During each year from 2016 through 2023, Banco Azteca had relationships with at least three banks in each given year capable of assisting it with repatriations of U.S. currency into the United States, and was always able to move such currency back to America.

131.    By misleading the public into believing that Sunwest is the only bank that dares engage in correspondent banking with Banco Azteca, the Article portrays Sunwest as reckless and tolerant of criminality.

132.    The story's statements that Sunwest partnered with a bank that was "working for criminal groups responsible for pouring deadly fentanyl into our state" is false and totally unsupported. There is simply no truth to the idea that Banco Azteca was "working for" any criminal group responsible for trafficking in fentanyl that arrived in Wisconsin.

133.    Although many of the statements in the Article refer to Banco Azteca, the true focus of the report is Sunwest. The Article opens with an eye-catching lede that lists Banco Azteca's supposed problems, and then pivots to its main subject, stating that "**Sunwest Bank,** the Utah-based financial institution run by Republican U.S. Senate candidate **Eric Hovde**, doesn't mind doing business with it."

134.    This clear thesis statement combines with the Article's headline ("Democrats question Eric Hovde over his bank's $26M deal with troubled Mexican bank") and its many references to the Sunwest-Azteca relationship to convey a clear message to readers that is unmistakably *about* Sunwest.

***Defendants Published the Article Recklessly or With Knowledge of the Falsity of the False Statements***

135.     Defendants acted with reckless disregard as to whether the statements in the Article were true.

136.     The most important evidence of this is the raft of falsehoods included in the Article as shown above.

137.     Furthermore, before publication of the Article, Sunwest communicated to Defendants with particularity that (a) Sunwest and Banco Azteca have extensive systems in place to identify and prevent money laundering and other crimes; (b) every aspect of Sunwest's business relationship with the Banco Azteca is highly regulated and overseen by the federal government; (c) Sunwest conducts its Repatriation program legally and in accordance with best practices; (d) Sunwest has never and would never knowingly do business with any bank or other entity involved in the criminal activities alleged in the Article; (e) based on its review of Banco Azteca, there is no credible evidence that Banco Azteca is working with any Mexican drug cartel or is in any way engaged in or facilitating money laundering or other crimes; (f) Sunwest does not participate in any remittance program with Banco Azteca, and (g) if any of the False Statements were accurate, Sunwest would be in violation of laws and regulations and unable to legally conduct business or provide financial services.

138.     Defendants ignored these corrective statements in publishing the Article.

139.     Furthermore, the Article relies on statements of a political operative commenting on a specialized and niche field, without seeking any input from banking experts, government officials, or even reporters with experience in complex banking transactions.

140.     The Article inserts multiple statements and assertions relating to remittances – the practice of sending money back into the United States – which is entirely unrelated to any part of the Sunwest-Azteca relationship.

141.     The Article insinuates multiple contact points with criminality, despite the fact that Sunwest advised Defendants that after so much regulatory cooperation and oversight, there would be enforcement actions had any wrongdoing taken place.

142.     The Article also withholds a number of facts which would have been highly mitigating to the negative impressions it conveyed, including Banco Azteca's multiple existing correspondent banking relationships, the prominent participation of Bank of America in correspondent banking, and the particular attention already given by regulators to the particular transaction under review, raising no concerns.

143.     Everything in the Article is phrased to maximize the impression of wrongfulness by Sunwest in carrying on its relationship with Banco Azteca.

144.     An example of this artful phrasing is evidence in a mischaracterization of one of Mr. Hovde's quotes in the story, in which Mr. Bice states that Hovde claimed that "Sunwest *now* is one of three banks that work, in collaboration with the Federal Reserve, with the Mexico City-based bank." (emphasis added.) This phrasing makes it look like Mr. Hovde accepted the proposition that there were not such relationships in 2021.

145.     He never said anything suggesting that. In his correspondence with Mr. Bice, he simply stated that "there are two other banks that import bank notes in collaboration with the Federal Reserve from Banco Azteca."

146.     By adding the "now" in his story, Mr. Bice made it appear that in prior years there had been no such relationships – a false implication that was intentional.

147.     These and other distortions of fact, artful terminology, failures to including exonerating facts, and reliance on skewed or biased comments, show that Defendants acted maliciously and with a clear intention to convey defamatory implications to their audience, and thus to injure Sunwest.

### *Dissemination of the Article*

148.     Instead of publishing credible information, Defendants published the Article with the False Statements to generate online traffic premised on information related to a heated political campaign that intentionally disparages Sunwest, a non-public, private party.

149.     Upon information and belief, Defendants intended to secure widespread notice for the Article and further promoted the Article by causing the Article's headline to appear, with links, on the Journal Sentinel's website and through other means despite knowing its falsity.

150.     Upon information and belief, a copy of the Article was delivered to each of the Journal Sentinel's approximately 48,000 print subscribers, which includes Utah residents and subscribers who are located in Utah.

151.     The Article was posted to the Journal Sentinel's website and remains available there at   https://www.jsonline.com/story/news/politics/elections/2024/09/19/democrats-question-eric-hovde-over-his-banks-deal-with-mexican-bank/75209295007/.

152.     The Article is therefore available to any individual with an internet connection.

153.     Further, the contents of the False Statements, since they were published by Defendants who hold themselves out as upholding the principles of journalistic integrity, have

been reprinted and incorporated into other articles and TV advertisements, further harming Sunwest.

154. Upon information and belief, as a result of the efforts of Defendants, the Article has been linked to or referenced on multiple online platforms, including X (formerly known as Twitter) and Reddit.

155. Upon information and belief, the Article has been viewed online by thousands of individuals, including those located and residing in Utah.

156. Indeed, Sunwest's Utah customers have contacted Sunwest through its Utah headquarters to discuss their concerns about the accusations described in the False Statements.

157. The Article's contents and the False Statements are defamatory because they affirmatively state that Sunwest, by working with Banco Azteca, is illegally providing financial services to Mexican drug cartels.

158. The Article's contents and False Statements are also defamatory because a reasonable person would conclude that the False Statements—such as, but not limited to, those that Banco Azteca is a "bank link[ed] to the Mexican drug cartel" and has been "[d]ropped as a financial partner by [other] U.S. banks"—communicate that Sunwest is breaking the law by having a relationship with and providing correspondent banking services to Banco Azteca.

159. Defendants also defame Sunwest because the Article communicates that Sunwest has broken federal law by failing to ensure that both itself and Banco Azteca have adequate systems in place to prevent money laundering.

160.    And, by linking Sunwest to alleged criminal activities, the publication of the Article has caused ongoing harm to Sunwest's reputation, its ability to attract and retain customers, and its potential to continue growing into new states and markets.

161.    Thus, Defendants have made reputationally damning statements about Sunwest, affecting Sunwest's current and prospective customers. Furthermore, if such statements were true, these allegations would subject Sunwest to regulatory investigations, enforcement actions, and other significant legal ramifications. Accordingly, the accusations of Mr. Wolk and of Journal Sentinel accuse Sunwest of criminal and/or highly illegal conduct.

162.    Banking regulators and agents of law enforcement agencies recognize statements about links between an American bank and criminal organizations as being highly suggestive of criminal behavior or, at the very least, non-compliance by the bank.

163.    Although some business might not come under immediate government scrutiny if they are seen as conducting transactions with those controlled by criminal organizations, an American bank is likely to come under such suspicion if credibly accused of such ties.

164.    Thus, the False Statements and implications arising from the Article regarding Sunwest allege criminal conduct on the part of Sunwest, as well as conduct that is incongruous with the exercise of a lawful business, trade, profession, or office.

165.    The Article discusses Eric Hovde, who is a current candidate for the United States Senate. However, Sunwest is not a participant in that campaign, nor has it inserted itself into the campaign or the public discussion surrounding it. Accordingly, Sunwest is not a public figure for purposes of applying any defamation privilege.

166. Defendants may not seek to impose a heightened standard of fault to govern their defamatory statements against a private banking institution merely because those statements were made in the context of a political campaign that does not involve Sunwest.

## FIRST CAUSE OF ACTION
### (Defamation and Defamation Per Se – Both Defendants)

167. Sunwest incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

168. Defendants published the Article (or caused the Article to be published) in the print and online editions of the Journal Sentinel.

169. Defendants also published the Article to the Journal Sentinel's website, which remains available there at https://www.jsonline.com/story/news/politics/elections/2024/09/19/democrats-question-eric-hovde-over-his-banks-deal-with-mexican-bank/75209295007/.

170. Defendants intended the Article and False Statements to refer to Sunwest, which was specifically identified in the Article.

171. Alternatively, Defendants acted negligently in failing to anticipate the facts or circumstances that would cause a reader of the Article and/or False Statements to reasonably understand the Article and/or False Statements to Sunwest.

172. The False Statements and implications arising from the Article regarding Sunwest are presented as statements of fact, not opinion. To the extent any of the statements are couched as opinions, the surrounding context suggests to the reader that such statements are premised on facts known to the speaker, including Mr. Wolk.

173.     The False Statements and implications arising from the Article regarding Sunwest are not privileged.

174.     The False Statements and implications arising from the Article regarding Sunwest are false.

175.     Defendants knew or should have known the False Statements and implications arising from the Article regarding Sunwest were false based on information provided to them prior to publication, based on review of the materials cited in the Article, and based on publicly available information known to them or that they would have discovered had they undertaken reasonable journalistic due diligence.

176.     Accordingly, at the time Defendants published the Article with the False Statements, they did not take reasonable care to avoid the publication of substantially false statements as they had actual knowledge the False Statements were false or should have entertained serious doubts as to whether the False Statements were true.

177.     Put simply, Defendants have acted with knowledge of the falsity of the Article, or with reckless disregard of its truthfulness, and without care for the injuries it caused as set forth above.

178.     Defendants intended the false statements in the Article to convey defamatory meanings to their audience and thus to cause harm to Sunwest, and intended the same with respect to the false implications.

179.     The False Statements call into question Sunwest's honesty, integrity, virtue, and/or reputation, and thereby expose Sunwest to public hatred, contempt, or ridicule in the eyes of at least a substantial and respectable portion of its audience.

180.     The Article constitutes defamation *per se* because the Article accuses Sunwest of involvement in or responsibility for money laundering, drug trafficking, kidnapping, and bribery, or, at minimum, of knowingly doing business with a Mexican bank that engages in such activity.

181.     The Article also accuses Sunwest of conduct which is incongruous with the exercise of a lawful business, trade, profession, or office.

182.     The serial and ongoing publication of the Article is causing, and will continue to cause, injuries to Sunwest.

183.     That necessarily includes reputational harm to Sunwest, including, without limitation, lost business opportunities.

184.     As a result, Sunwest has suffered actual damages in an amount to be proven at trial, but in no event less than $2,000,000.00.

185.     Defendants' acts demonstrate willful or reckless indifference to Sunwest's rights and are so egregious as to warrant punitive damages in support of this cause of action.

## SECOND CAUSE OF ACTION
### (False Light – Both Defendants)

186.     Sunwest incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

187.     Defendants published the Article (or caused the Article to be published) in the print and online editions of the Journal Sentinel.

188.     Defendants also published the Article to the Journal Sentinel's website, which remains                          available                          there                          at https://www.jsonline.com/story/news/politics/elections/2024/09/19/democrats-question-eric-hovde-over-his-banks-deal-with-mexican-bank/75209295007/.

189.     Defendants published the False Statements about Sunwest, which objectively include statements and implications that would communicate to a reasonable reader (and was intended to do so) that Sunwest does business with a cartel-linked Mexican bank that is involved in money laundering, drug trafficking, kidnapping, and bribery, and therefore that Sunwest shares responsibility for those actions.

190.     The False Statements and implications arising from the Article place Sunwest before the public in a false light.

191.     The false light in which Sunwest has been placed would be highly offensive to any reasonable person, as it associates Sunwest with the criminal activity alleged in the Article, including, without limitation, that Sunwest does business with a cartel-linked Mexican bank that is involved in money laundering, drug trafficking, kidnapping, and bribery, and therefore that Sunwest shares responsibility for those actions.

192.     Defendants knew or should have known the False Statements and implications arising from the Article regarding Sunwest were false based on information provided to them prior to publication, based on review of the materials cited in the Article, and based on publicly available information known to them or that they would have discovered had they undertaken reasonable journalistic due diligence.

193.     Accordingly, at the time Defendants published the Article with the False Statements, they did not take reasonable care to avoid the publication of substantially false statements, as they had actual knowledge the False Statements were false or should have entertained serious doubts as to whether the False Statements were true.

194.     Put simply, Defendants have acted with knowledge of the falsity of the Article, or with reckless disregard of its truthfulness, and without care for the injuries it caused, as set forth above.

195.     The serial and ongoing publication of the Article is causing, and will continue to cause, enormous injuries to Sunwest.

196.     That necessarily includes reputational harm to Sunwest, including, without limitation, lost business opportunities.

197.     As a result, Sunwest has suffered actual damages in an amount to be proven at trial, but in no event less than $2,000,000.00.

198.     Defendants' acts demonstrate willfulness or reckless indifference to Sunwest's rights and are so egregious as to warrant punitive damages in support of this cause of action.

### THIRD CAUSE OF ACTION
### (Permanent Injunction – Both Defendants)

199.     Sunwest incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

200.     Defendants' actions have caused, and are substantially likely to continue to cause, irreparable harm to Sunwest.

201.     Defendants' actions are ongoing and are substantially likely to continue.

202.     Sunwest's claims are meritorious, and Sunwest should prevail on its above causes of action.

203.     The balance of harms between the parties strongly favors entry of an injunction against Defendants.

204.     Public policy strongly favors entry of an injunction so as to prevent further falsehoods and additional irreparable injuries to Sunwest.

205.     Accordingly, Sunwest is entitled to a permanent injunction restraining Defendants from making disparaging statements regarding Sunwest in any medium or forum.

## JURY DEMAND

Sunwest respectfully demands a trial by jury of any issue so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Sunwest demands judgment as follows:

1.     That judgment be entered in favor of Sunwest;

2.     That Sunwest be awarded compensatory damages for costs and damages incurred as a result of the above-described actions in an amount to be determined at trial, but not less than the threshold amount for a Tier 3 case;

3.     That Sunwest be awarded a permanent injunction against Defendants, restraining them from further publishing the False Statements or any similar statements.

4.     That Sunwest be awarded post-judgment interest at the highest amount permitted by law;

5.     That Sunwest be awarded its costs and fees associated with bringing this case;

6.     That Sunwest be awarded punitive damages, as allowed by law, for Defendants' intentionally tortious conduct and reckless indifference for Sunwest's rights as may be determined at trial; and

7.     That the Court grant such other relief as it may deem just and proper.

DATED: October 18, 2024.

Respectfully submitted,

**KUNZLER BEAN & ADAMSON, PC**


*/s/ Ryan B. Bell*
Ryan B. Bell
Shelby Jaye Hughes

*Attorneys for Plaintiff Sunwest Bank*